[No. H024375. Sixth Dist. July 29, 2004.]

WILLIAM McLEOD REEVES, Plaintiff and Appellant, v.
SAFEWAY STORES, INC., Defendant and Respondent.

COUNSEL

Theresa L. Pfeiffer for Plaintiff and Appellant.

Nancy E. Pritikin and Neda N. Dal Cielo for Defendant and Respondent.

OPINION

**RUSHING, P. J.**—The Fair Employment and Housing Act, Government Code sections 12900 et seq. (FEHA), prohibits an employer from firing a worker in retaliation for the worker's complaining about incidents of sexual harassment in the workplace. (Gov. Code, § 12940, subds. (h), (j).)[1] An employer can defeat such a claim by showing that it acted not in response to the worker's complaints but for legitimate, nonretaliatory reasons. This case presents the question whether an employer may be liable for retaliatory discharge when the supervisor who initiates disciplinary proceedings acts with retaliatory animus, but the cause for discipline is separately investigated and the ultimate decision to discharge the plaintiff is made by a manager with no knowledge that the worker has engaged in protected activities. We hold that so long as the supervisor's retaliatory motive was an actuating, but-for cause of the dismissal, the employer may be liable for retaliatory discharge. Here the evidence raised triable issues as to the existence and effect of retaliatory motive on the part of the supervisor, and as to whether the manager and the intermediate investigator acted as tools or "cat's paws" for the supervisor, that is, instrumentalities by which his retaliatory animus was carried into effect to plaintiff's injury. We therefore reverse a summary judgment granted to the employer.

FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff William McLeod Reeves worked for defendant Safeway Stores, Inc. (Safeway) as a food clerk from May 1969 until his discharge in July 1998. In or before late 1997, he became aware of conduct that he believed constituted sexual harassment of female employees in the store where he worked. The main offenders seemed to be Brian Sparks and Steve Prodes, the night manager. At least two female workers complained to plaintiff about the problem, and at least one of them asked him to speak to store management about it. In December 1997, and several times thereafter, plaintiff complained to store manager Fred Demarest. Plaintiff testified that Demarest seemed resentful and sought to "trivialize" the complaints, initially saying something

---

[1] At the time of the events in question, subdivisions (h) and (j) of section 12940 were designated (f) and (h), respectively. (Cf. *Stats. 1993*, ch. 711, § 2, pp. 4042–4043; *Stats. 2000*, ch. 1049, § 7.5.) For convenience we refer to these provisions by their current designation.

to the effect that women were "not such pure innocent things" as plaintiff supposed, and later telling plaintiff, "Bill, as far as I'm concerned, unless these gals come to me and complain about it . . . , the problem exists between your ears." Demarest testified that in response to plaintiff's complaints he asked "many employees" if they were experiencing sexual harassment, and "got absolutely nothing back that was conclusive or that even hinted of sexual harassment." However Stephanie Alves testified that she herself complained directly to Demarest, with no apparent result, about an episode of what she considered sexual harassment by Sparks and Prodes. She also heard store manager Henry Sukovaty refer to plaintiff sarcastically as "Mr. Sexual Harassment."[2] Sukovaty himself had, according to Alves, made inappropriate sexual comments to her. Within a year after plaintiff's dismissal, Prodes was discharged for sexual harassment.

District manager Moira Susan Hollis testified that "if someone makes a complaint to the store manager about sexual harassment, the store manager is supposed to . . . give that complaint to [the human resources department]" for investigation. She further testified that Demarest behaved inappropriately if, as he and plaintiff testified, he conducted his own investigation rather than referring plaintiff's complaints to human resources.

Although plaintiff's shift ended at midnight, he sometimes remained past that time to socialize with coworkers. Demarest testified that he "asked" plaintiff "on a couple of occasions not to enter the store after closing." Plaintiff asserted that coworker Ricky Bloor had relayed a statement by Demarest that plaintiff "should not stay too long" after his shift ended. Plaintiff declared that he "respected" this request. Contrary to repeated suggestions in Safeway's brief, there is no evidence, controverted or otherwise, that Demarest ever gave plaintiff an order, instruction, or directive on this point, as distinct from a request or suggestion.

At 12:00 a.m. on May 31, 1998, plaintiff ended his last shift before taking a few days' vacation. He left the store shortly after midnight, but returned almost immediately in response to an urgent need to use the rest room.[3]

---

[2] After plaintiff's discharge, Sukovaty was heard to remark that "the reason why [plaintiff is] not here after 28 years is because all the women would go up to him and talk to him about sexual harassment and ask him what they should do." Defendant does not object to this evidence, or seek to limit the purposes for which it may be considered.

[3] Plaintiff asserts that he was suffering from diarrhea. He neglected to provide a sworn statement squarely to this effect in opposition to the motion, but the record does contain evidence in the form of (1) his deposition testimony that he "needed to use the men's room," and that he described this need to Juarez as "an emergency"; (2) his sworn statement that in the spring of 1998 he was experiencing diarrhea as a side-effect of medication; and (3) his unsworn statement that he "had an attack of diarrhea due to medication he was taking," which is found in Harrison's investigation report. Defendant has at no time contended that plaintiff

Sandy Juarez, who was apparently in charge of the night crew, opened the door enough to talk to plaintiff, but refused to let him enter the store. Plaintiff testified that he told her he needed to come in so he could "get some stuff out of my locker and . . . use the [men's] room." She replied that she had been instructed not to let anybody into the store after it closed. He said, "This is important. This is an emergency. I have to use the rest room." She said, "[I]f you come in, I'm going to call security."

Juarez testified that when she refused to admit plaintiff to the store, he became very agitated and irate, and began swearing. She said he "shoved [her] through the door to enter into the store," pushing her backwards with both hands. Brian Sparks testified in deposition that he saw the door hitting Juarez and defendant's "hand pushing her," and that, right after the incident, plaintiff approached Sparks and another employee in the parking lot to say he had pushed Juarez "gently" out of his way. However, plaintiff denies that he touched Juarez at all, and denies that he told the two coworkers he had done so.[4]

After entering the store plaintiff went to a back room where he encountered Sparks. Plaintiff told Sparks that Juarez had "hassled" him "about getting back into the store to use the bathroom." He added that Juarez was a "fucking waste of air." On his way up the stairs he encountered Barbara Flagen-Spicher, who demanded an apology, which he gave her, for his language.

Meanwhile Juarez had called the police. When they arrived, Juarez told them plaintiff had pushed her. There is no indication that they took a report, or indeed took the matter seriously. Plaintiff testified that after advising him to take the matter up with his union, they left him talking to Juarez. He himself then left, but returned about an hour later in hopes of seeing fellow clerk Staci Siaris at the beginning of her shift. He testified that he wanted to give her some reading material, repay a small debt, and tell her about the incident with Juarez. He followed her into the store while carrying a lit cigarette. He testified that he had forgotten he had a cigarette in his hand, and that he left the store after a few seconds.

About 7:15 the next morning, after the store had opened, plaintiff returned in the hope of talking to Demarest about the previous night's

---

failed to adequately substantiate the existence of this medical condition for purposes of summary judgment, or that he will have any difficulty presenting competent evidence of it at trial.

[4] We also note some basis to question Sparks's testimony that he witnessed the confrontation between Juarez and plaintiff. Juarez testified that she did not recall Sparks being in the vicinity of the confrontation, and thought he had left the area when it occurred. Plaintiff testified that Sparks appeared surprised to see him when, immediately following the confrontation, he encountered Sparks in a back room of the store.

incident. He knew that Demarest was on vacation but thought he might come in to check the books. When Demarest did not appear, plaintiff lingered around the store, making a series of purchases. During this time he spoke to several employees and customers. Two workers testified that he had alcohol on his breath.[5] Plaintiff admitted he had a small amount to drink during the night, but one coworker testified that he detected no signs of intoxication. Juarez reportedly received a call from a self-described customer, complaining that the store should not permit employees on the premises after they had been drinking. She referred the call to assistant manager Sukovaty, who confronted plaintiff, implying that the customer said plaintiff was rude and had been drinking. Sukovaty told plaintiff to leave the store, stating that "this is a termination offense." Plaintiff complied, but returned to the store less than half an hour later to make another purchase.

When Demarest returned to work the next day (June 2, 1998), Juarez told him about her confrontation with plaintiff. He discussed the incident with Sparks and Flagen-Spicher, but never with plaintiff, who returned from vacation on June 7. On June 8, Demarest called Safeway's security department and spoke with security officer Darrell Harrison. Harrison testified that Demarest told him, "I have a problem at the store. Mr. Reeves is suspected of pushing Sandy Juarez, his front end manager, and I'd like you to take a look at it. I started a preliminary investigation. I talked to a couple employees. This is what they're telling me. It's obviously a security issue, possibly workplace violence, and come in and take over the investigation." There is no evidence that Demarest spoke to human resources before contacting security. He testified that he referred the matter to security merely because "they were a little more experienced with it." Harrison apparently endorsed this action because, as he testified, "Workplace violence is always a security issue."

On June 10, 1998, Demarest and Harrison summoned plaintiff away from his checkstand and told him they wanted to ask some questions. Plaintiff was troubled by the seriousness of their tone and said he wanted to arrange for union representation. Harrison postponed the meeting for that purpose while placing plaintiff on suspension. On June 17, plaintiff met with Harrison, another Safeway security agent, and a union representative. Plaintiff testified that the investigators asked him to recount the events of the evening of May 31 and peruse "a thick stack of Safeway rules." He told them that while he "did get in [Juarez's] face," he "didn't physically touch her." They asked why other witnesses would lie about what happened, and he said that there had been some incidents of sexual harassment and "other continuing

---

[5] Defendant cites the testimony of one coworker to this effect, and plaintiff admits that a second witness, Juarez, also so testified. Defendant also cites unsworn witness statements which, as noted below, were inadmissible. (See fn. 8, *post*.)

problems" that might have supplied motives. Plaintiff explained that Sparks, in particular, felt "a lot of resentment . . . for me after I had complained to him [*sic*] and after Sparks had apologized to four females in the store for having harassed them." Asked again if he explained these matters to investigators, he testified that Sparks and Prodes "did . . . come up."

On or before June 30, 1998, Harrison called district manager Hollis to tell her the results of his investigation.[6] Hollis testified that the conversation lasted 15 to 20 minutes. Harrison told her that the facts, as he had determined them, were that "there had been a situation at the store, the employee had been abusive with the person in charge, he had been under the influence of alcohol, and he had pushed the employee, and he had also been using profanity with and around other employees."[7] He recommended that plaintiff be discharged. Hollis decided to terminate plaintiff's employment before the conversation ended. In a declaration she stated that she made this decision because "Mr. Reeves' conduct on May 31, 1998 violated Safeway's store rules and policies/procedures." She gave no more specific explanation for this decision than in her deposition, where she stated, "We don't allow one employee to push another employee period."

Hollis did not review plaintiff's personnel file before deciding to dismiss him. She considered the length of his service to Safeway but was unaware of his several commendations and did not consider them. She was unfamiliar with his version of the incident, including his claimed need to use the restroom, and did not know whether Harrison had talked to plaintiff during his investigation. She was also unaware of any reasons for any of the witnesses to shade the truth, and in particular had no knowledge that plaintiff had complained about sexual harassment prior to his discharge.

At some point after his phone call to Hollis, Harrison prepared a 10-page "Investigation Report."[8] It referred to an "incident" of "Misconduct /Assault/Use of Profanity/Public Intoxication," occurring at 12:15 a.m. on

---

[6] The date is inferred from the fact that Harrison's report, which is dated June 30, 1998, refers to his telephone conversation with Hollis as a past event.

[7] In fact there is no evidence that plaintiff had consumed any alcohol at the time of his confrontation with Juarez. The reference to intoxication may reflect Hollis's conflation of the Juarez confrontation with the events of later that morning, after the store opened, or it may reflect conflation or coloring by Harrison.

[8] In opposition to the motion for summary judgment, plaintiff objected to the report, and all unsworn statements offered by defendant, as hearsay not within any exception. The report might have been admissible for a nonhearsay purpose if it were shown that Safeway relied on it in deciding to dismiss plaintiff, but Hollis flatly testified that she had never seen the report, which she supposed Harrison had prepared because "Safeway likes to have documentation on any terminations." Safeway made no attempt to lay a foundation for admission of these materials as, e.g., business records. (See Evid. Code, § 1271, subd. (c).) Indeed we doubt the competency of the attorney witness who purported to identify and thereby authenticate these

May 31, 1998. It identified Sandra Juarez as "Victim" and plaintiff as "Suspect." It recounted the confrontation between plaintiff and Juarez as related by Juarez and Sparks, and separately described the "interview" of plaintiff in which he gave his account of events.

On July 1, 1998, Hollis sent plaintiff a letter stating that he was terminated "for violation of company policy and/or procedures." On March 4, 1999, the Department of Fair Employment and Housing sent him a "Right-to-Sue Notice." A year later, plaintiff brought this action charging Safeway and fictitious defendants with violating FEHA by discharging him in retaliation for his complaints about sexual harassment. Safeway moved for summary judgment, contending that plaintiff could not establish a causal link between these complaints and his discharge, and that even if he could, Safeway had a legitimate reason for the discharge which plaintiff could not show to be pretextual. The court rejected the first argument, finding that plaintiff had made a threshold showing of a causal link. However, the court ruled that "Defendant met its burden of showing that it had a legitimate, non-discriminatory reason for terminating Plaintiff," and that "Plaintiff failed to raise a triable issue of material fact in this regard." The court granted the motion, and entered judgment for Safeway. Plaintiff filed this timely appeal.

DISCUSSION

## I. Defective Statement of Undisputed Facts

At the threshold we observe that defendant has made our task—and that of the trial court—considerably more burdensome by its failure to comply with the requirement of Code of Civil Procedure section 437c, subdivision (b)(1), that the moving party set forth *"plainly and concisely* all *material facts* which the moving party contends are undisputed." (Italics added.) Instead of stating clearly those material facts which actually are without substantial controversy, defendant offers a number of obliquely stated "facts" that are material only to the extent they are controverted, and uncontroverted only to the extent they are immaterial. For instance, defendant asserts various "undisputed facts" in terms not of relevant *events* but of what a witness has *said* about events, e.g., two Safeway employees "stated that Plaintiff followed them out of the store, telling them that he had moved Sandy Juarez out of the way by lightly/gently pushing her aside." It seems indisputably true that Brian Sparks

---

materials. (See Evid. Code, §§ 1400, 1401, subd. (a), 1413.) The trial court stated in its minute order that it had disregarded all incompetent and inadmissible evidence under *Biljac Associates v. First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1419–1420 [267 Cal.Rptr. 819]. We have likewise considered the investigation report and other unsworn materials only insofar as they contain or constitute statements admissible *against* defendant under Evidence Code sections 1220 et seq.

*so testified in deposition*, though there is no competent evidence of such a report by the other worker, Barbara Flagen-Spicher. (See fn. 9, *post*.) But what Sparks (or for that matter Flagen-Spicher) might have said *in deposition* is not, as such, a "material fact." It is of interest only as *evidence* of a material fact, e.g., that plaintiff made a damaging admission about his confrontation with Juarez. That "fact" is squarely controverted by plaintiff's declaration that he made no such statement. We emphatically condemn Safeway's attempt to circumvent that conflict by stating the supposed "fact" in an attributive form.

█ This stratagem takes an arguably even worse turn in Safeway's assertion of "facts" in the form of supposed *perceptions* by witnesses. Thus it is said to be undisputed that "Brian Sparks overheard" something, and that "Sandy Juarez and Staci Siaris both witnessed" something. Ordinarily, however, the perceptions of witnesses are simply not "material facts," as that term is used in the summary judgment statute. The relevant question is whether the *underlying* facts—the events or conditions witnesses say they perceived—are established without substantial controversy. Defendant merely clouds the inquiry into that question by formulating the operative facts in the intermediate form of a witness's perceptions or statements.

█ We believe trial courts have the inherent power to strike proposed "undisputed facts" that fail to comply with the statutory requirements and that are formulated so as to impede rather than aid an orderly determination whether the case presents triable material issues of fact. If such an order leaves the required separate statement insufficient to support the motion, the court is justified in denying the motion on that basis. (See § 437c, subd. (b)(1).) Here, however, the court reached the merits of the motion, and we will do likewise.

## II. *Defense of Ignorance*

█ On appeal from an order granting summary judgment "we must independently examine the record to determine whether triable issues of material fact exist. [Citations.]" (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143] (*Saelzler*).) The question is whether defendant " ' "conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial." [Citation.]' [Citation.]" (*Ibid.*; *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673–674 [25 Cal.Rptr.2d 137, 863 P.2d 207]; see *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 335, fn. 7 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*) ["the issue . . . is simply whether, and to what extent, the evidence submitted for and against the motion . . . discloses issues warranting a trial"].) We must "consider[] all the

evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.]" (*Guz, supra,* 24 Cal.4th at p. 334.) Moreover, "we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing [his] evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor. [Citations.]" (*Saelzler, supra,* 25 Cal.4th at p. 768; see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*) [trial court must view evidence and inferences "in the light most favorable to the opposing party"].) And a plaintiff resisting a motion for summary judgment bears no burden to establish any element of his or her case unless and until the defendant presents evidence either affirmatively *negating* that element (proving its absence in fact), or affirmatively showing that the plaintiff does not possess and cannot acquire evidence to prove its existence. (*Aguilar, supra,* 25 Cal.4th at pp. 854–855; *Saelzler, supra,* 25 Cal.4th at p. 768.)

Safeway first asserts that because Hollis did not know about plaintiff's complaints of sexual harassment, plaintiff cannot possibly show that his discharge was *caused by* those complaints. There is no doubt that a necessary element of plaintiff's case is a "causal link between [his] protected activity and the employer's action. [Citations.]" (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476 [4 Cal.Rptr.2d 522].) After all, FEHA prohibits adverse treatment "because of" protected activities. (See Gov. Code, § 12940, subd. (h).) However, on this record Hollis's ignorance of plaintiff's protected activities is not enough, by itself, to either conclusively negate this element or to establish plaintiff's inability to prove it at trial.

Defendant cites cases holding that an employer cannot be liable for retaliation (or discrimination) if it was unaware of the plaintiff's protected activities (or attributes). (*Cohen v. Fred Meyer, Inc.* (9th Cir. 1982) 686 F.2d 793, 796 (*Cohen*); *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 70 [105 Cal.Rptr.2d 652] (*Morgan*); see *Gunther v. County of Washington* (9th Cir. 1979) 623 F.2d 1303, 1316 (*Gunther*); *McCollum v. Bolger* (11th Cir. 1986) 794 F.2d 602, 610 (*McCollum*); *Talley v. United States Postal Service* (8th Cir. 1983) 720 F.2d 505, 508 (*Talley*); *Moore v. Reese* (D.Md. 1993) 817 F.Supp. 1290, 1298 (*Moore*).) These cases are rooted in the commonsense notion that one cannot be motivated by an event or condition of which one is wholly ignorant. I may have many reasons to plant a tree in front of my neighbor's window, but retaliation for his trespassing on my property cannot be one of them if I have no inkling of his having done it. By the same practical logic, if a worker's protected activities are completely unknown to his or her employer, no act by the employer can be said to have been taken "because of" those activities.

This concept—which for convenience we will call the "defense of ignorance"—poses few analytical challenges so long as the "employer" is conceived as a single entity receiving and responding to stimuli as a unitary, indivisible organism. But this is often an inaccurate picture in a world where a majority of workers are employed by large economic enterprises with layered and compartmentalized management structures. In such enterprises, decisions significantly affecting personnel are rarely if ever the responsibility of a single actor. As a result, unexamined assertions about the knowledge, ignorance, or motives of "the employer" may be fraught with ambiguities, untested assumptions, and begged questions.

■ The issue in each case is whether retaliatory animus was a but-for cause of the employer's adverse action. (See *Clark v. Claremont University Center* (1992) 6 Cal.App.4th 639, 665, fn. 6 [8 Cal.Rptr.2d 151] (*Clark*), quoting *McDonald v. Santa Fe Trail Transp. Co.* (1976) 427 U.S. 273, 282, fn. 10 [49 L.Ed.2d 493, 96 S.Ct. 2574] [plaintiff need not show action was taken " 'solely on the basis of his race' "; " 'no more is required to be shown than that race was a 'but for' cause' "]; *Brown v. Smith* (1997) 55 Cal.App.4th 767, 783 [64 Cal.Rptr.2d 301] [elements of claim for sexual harassment include "that the offensive act would not have happened but for" plaintiff's sex].) Logically, then, the plaintiff can establish the element of causation by showing that *any* of the persons involved in bringing about the adverse action held the requisite animus, provided that such person's animus operated as a "but-for" cause, i.e., a force without which the adverse action would not have happened. Certainly a defendant does not conclusively negate the element of causation by showing only that some responsible actors, but not all, were ignorant of the occasion for retaliation.

This point was implicitly recognized in *Clark*, where the court wrote that a plaintiff claiming discrimination in the denial of academic tenure " 'need not prove intentional discrimination at every stage of the review process. . . . [I]t plainly is permissible for a jury to conclude that an evaluation at any level, if based on discrimination, influenced the decisionmaking process and thus allowed discrimination to infect the ultimate decision.' [Citation.]" (*Clark, supra,* 6 Cal.App.4th at pp. 665–666, quoting *Roebuck v. Drexel University* (3d Cir. 1988) 852 F.2d 715, 727.)

Again the point may be easily illustrated. A supervisor annoyed by a worker's complaints about sexual harassment might decide to get rid of that worker by, for instance, fabricating a case of misconduct, or exaggerating a minor instance of misconduct into one that will lead to dismissal. Another manager, accepting the fabricated case at face value, may decide, entirely without animus, to discharge the plaintiff. It would be absurd to say that the plaintiff in such a case could not prove a causal connection between

discriminatory animus and his discharge. The situation is equivalent to one in which the supervisor simply fires the worker in retaliation for protected conduct. The supervisor's utilization of a complex management structure to achieve the same result cannot have the effect of insulating the employer from a liability that would otherwise be imposed.[9]

■ Of the pertinent cases we have reviewed, the vast majority may be understood to acknowledge, at least by implication, that ignorance of a worker's protected activities or status does not afford a categorical defense unless it extends to *all* corporate actors who contributed materially to an adverse employment decision. (See *Fisher v. Vassar College* (2d Cir. 1997) 114 F.3d 1332, 1338, fn. 4 (en banc) ["the fact of multiple decision-makers should not insulate decisions permeated by the discrimination of individual participants"]; *Morgan, supra,* 88 Cal.App.4th at p. 73, 105 Cal.Rptr.2d 652 ["all of the actual decision makers responsible for failing to rehire appellant in 1996 affirmatively stated in their declarations that they were not aware of appellant's grievance or past complaints"]; *Cohen, supra,* 686 F.2d at p. 797, fn. 5 [there was "no evidence that any company official or employee who had knowledge of [plaintiff's protected conduct] had any part in the [adverse] policy decision"]; *Gunther, supra,* 623 F.2d at p. 1316 [no showing that "defendants" knew plaintiff had sought higher pay for female workers]; *Brown v. Sears Automotive Center* (M.D.N.C. 2002) 222 F.Supp.2d 757, 762–764 [supervisor declared that "she alone made the decision to terminate" and did not know plaintiff had filed protected complaint]; *Featherson v. Montgomery County Public Schools* (D.Md.1990) 739 F.Supp. 1021, 1025–1026 (mem.) [noting "absolutely no evidence that the persons involved in any of the alleged adverse decisions . . . knew at the time that the decisions were made that plaintiff had filed any EEO claims"]; *Garcia v. American Airlines, Inc.* (D.Puerto Rico 1987) 673 F.Supp. 63, 65, 67 [neither supervisor who decided to fire plaintiff nor manager who reviewed decision knew of protected activity]; *Lihosit v. I & W, Inc.* (N.M.App. 1996) 121 N.M. 455, 457, 459 [913 P.2d 262, 264, 266] ["[n]o employee" of employer,

---

[9] Our emphasis on the conduct of *supervisors* is not inadvertent. An employer can generally be held liable for the discriminatory or retaliatory actions of supervisors. (*Shager v. Upjohn Co.* (7th Cir. 1990) 913 F.2d 398, 404–405 (*Shager*).) The outcome is less clear where the only actor possessing the requisite animus is a nonsupervisory coworker. (See *ibid.,* and cases cited; cf. *Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994, 1007 [112 Cal.Rptr.2d 347] [managerial failure to prevent sexual harassment by coworker could operate as ratification, rendering employer liable]; *Knox v. State of Ind.* (7th Cir. 1996) 93 F.3d 1327, 1334 [employer can be liable for retaliatory actions by plaintiffs' coworkers when it "know[s] about and fail[s] to correct the offensive conduct"]; *Gunnell v. Utah Valley State College* (10th Cir. 1998) 152 F.3d 1253, 1265 [to similar effect].) We have assumed for present purposes that these principles would permit imputation to Safeway of retaliatory conduct by persons properly found to be supervisors—a status we assume was held by Demarest. However these issues have not yet been addressed by the parties, and we should not be understood to have actually decided them.

including "in particular" the supervisor who fired plaintiff, knew of plaintiff's claim that statutory work-time limitations precluded compliance with order; "an employee fails to prove the causal connection necessary to sustain a claim for retaliatory discharge when there is no evidence that the *persons responsible for his discharge* had any knowledge the employee engaged in an activity alleged to be protected" (italics added)].)

A few decisions fail to reflect this awareness.[10] However no case known to us holds that the ignorance of a "decisionmaker" would still categorically shield the employer from liability if other substantial contributors to the decision bore the requisite animus. (But see *Hill v. Lockheed Martin Logistics Management, Inc.* (4th Cir. 2004) 354 F.3d 277, 290–291 (fn. 16, *post*).)

■ Here defendant's claim of ignorance focuses exclusively on the undisputed fact that district manager Hollis, who made the formal decision to terminate plaintiff's employment, did not know of plaintiff's complaints about sexual harassment. But it is clear that Hollis was not the only actor who materially contributed to plaintiff's discharge. Judging from her deposition testimony, her decision really amounted to little more than the ratification of Harrison's recommendation, which was itself the penultimate event in a chain commencing with a report to Demarest from night manager Juarez, followed by Demarest's referral to Safeway's security department, which produced a debatably evenhanded "investigation" by Harrison (see following part), which concluded with the recommendation adopted by Hollis. Hollis's decision to discharge plaintiff was based entirely on what Harrison told her in a 20-minute telephone conversation, the contents of which she appeared largely unable to recall. Under such circumstances Safeway could not conclusively negate the element of causation merely by showing Hollis's ignorance of plaintiff's protected conduct.

## III. *Nonretaliatory Motive*

### A. *Principles*

Defendant's second argument is, in essence, that plaintiff failed to present sufficient evidence of retaliatory animus to effectively controvert defendant's

---

[10] In some decisions only a single actor is involved and the facts present no occasion to consider the multiple-actor problem. (E.g., *McCollum, supra,* 794 F.2d at p. 606 [claim based on employment actions by local postmaster with whom plaintiff and his family were "feuding"]; *Talley, supra,* 720 F.2d at p. 508 [temporary letter carrier discharged after twice losing keys; assistant branch manager, who fired her, was unaware of her prior EEOC claims].) We have examined two other decisions in which the authoring courts evinced no awareness of the multiple-actor problem, even though it was arguably implicated by the facts. (*Dowe v. Total Action Against Poverty in Roanoke Valley* (4th Cir. 1998) 145 F.3d 653, 655, 657; *Moore, supra,* 817 F.Supp. 1290.) Nothing in those decisions causes us to question the rule we adopt.

showing that his discharge rested on a genuinely held, nonretaliatory motive, i.e., a belief that he had engaged in serious misconduct warranting dismissal.

 Both parties seem to accept that defendant's claim of a legitimate nondiscriminatory reason for discharging plaintiff should be analyzed within the three-step analytical framework adopted by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802–804 [36 L.Ed.2d 668, 93 S.Ct. 1817] (*McDonnell Douglas*).[11] Under that framework, the plaintiff may raise a presumption of discrimination by presenting a "prima facie case," the components of which vary with the nature of the claim, but typically require evidence that "(1) [the plaintiff] was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse

---

[11] Plaintiff has not invoked the competing model of " ' "mixed motive" ' " analysis, under which a case goes to the jury if there is evidence that an impermissible criterion " ' "was a motivating factor for any employment practice." ' " (*Desert Palace, Inc. v. Costa* (2003) 539 U.S. 90, 94 [156 L.Ed.2d 84, 123 S.Ct. 2148] (*Desert Palace*); see *Price Waterhouse v. Hopkins* (1989) 490 U.S. 228, 277 [104 L.Ed.2d 268, 109 S.Ct. 1775] (conc. opn. of O'Connor, J.) (*Price Waterhouse*); *Heard v. Lockheed Missiles & Space Co., Inc.* (1996) 44 Cal.App.4th 1735, 1748 [52 Cal.Rptr.2d 620]; *Fernandes v. Costa Bros. Masonry, Inc.* (1st Cir. 1999) 199 F.3d 572, 579–580.) This model presents its own perplexities—beginning with its label—but has the virtue of a more direct and logical method for the assessment of conflicting proofs of motive than has developed under what Judge Posner calls "the *McDonnell Douglas* quadrille." (*Shager, supra,* 913 F.2d at p. 401.)

"Mixed motive" analysis was formerly held unavailable unless the plaintiff offered "direct" evidence of discriminatory motive—whatever that means. (*Price Waterhouse, supra,* 490 U.S. at pp. 277–278.) However Congress and the Supreme Court have lifted that restriction for at least some federal claims. (*Desert Palace, supra,* 539 U.S. at pp. 101–102].) This raises the possibility—some would say "hope"—that the "mixed motive" approach may displace all but the first stage of the *McDonnell Douglas* framework. That framework is perfectly serviceable when confined to its proper field of operation, but its frequent misconstruction has led too many courts to replace basic principles of procedure, evidence, and logic with elaborate and essentially arbitrary obstacles to relief.

 Foremost among these is the notion, which pervades innumerable decisions, that on summary judgment in a case of this kind, the "ultimate issue" is "pretext." (*Hugley v. Art Institute of Chicago* (N.D.Ill 1998) 3 F.Supp.2d 900, 906, fn. 7.) Certainly "pretext" is a useful term for encapsulating certain recurring concepts or patterns in a discrimination case, but calling it the "ultimate issue" is like saying, in a traffic case where two drivers give mutually irreconcilable testimony about who had the green light, that the "ultimate issue" is "perjury." In both cases one can decide the *real* ultimate issue—the state of the traffic signal, or the role of discriminatory animus—without deciding that one version of events was perjurious, or that a stated reason was "pretextual." We do not doubt that a general correlation exists between pretext and discrimination: If the fact finder in a FEHA case refuses to credit an employer's innocent explanation, and finds that the employer really acted for retaliatory or discriminatory reasons, it will usually be accurate to also conclude that the innocent explanation was a "pretext." The confusion arises when the correlative conclusion is viewed as a necessary prerequisite, so that the "pretext" tail wags the whole anti-discrimination dog. As conceived by the high court in *McDonnell Douglas* and its sequelae, "pretext" is merely one way of raising an inference of discrimination—not an indispensable precondition to such an inference.

employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive. [Citations.]" (*Guz, supra,* 24 Cal.4th at p. 355.) A satisfactory showing to this effect gives rise to a presumption of discrimination which, if unanswered by the employer, is mandatory—it requires judgment for the plaintiff. (*Ibid.*) However the employer may dispel the presumption merely by articulating a legitimate, nondiscriminatory reason for the challenged action. (*Id.* at pp. 355–356.) At that point the presumption disappears. (*Id.* at p. 356.) Indeed, when the employer proffers a facially sufficient lawful reason for the challenged action, the entire *McDonnell Douglas* framework ceases to have any bearing on the case, and the question becomes whether the plaintiff has shown, or can show, that the challenged action resulted in fact from discriminatory animus rather than other causes. (*Clark, supra,* 6 Cal.App.4th at p. 664, quoting *Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 256 [67 L.Ed.2d 207] [once employer puts forward nondiscriminatory reason, plaintiff's burden " 'merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination' " which he meets " 'by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. [Citation.]' "].)[12]

Here it is undisputed that Safeway has articulated a legitimate nondiscriminatory reason for its actions *with respect to district manager Hollis*, who made the ultimate decision to discharge plaintiff.[13] The record supports a

---

[12] Thus, rather than speaking of a *McDonnell Douglas* "test" or "framework," courts would reduce confusion by speaking of "the *McDonnell Douglas presumption*," since the only real effect of the case, properly understood, is to grant the plaintiff a presumption, sufficient to survive the early stages of litigation, by showing circumstances consistent with, or suggestive of, actionable discrimination. The presumption thus so easily erected is just as easily torn down; even the guiltiest employer can almost certainly concoct some facially plausible explanation for its actions. The explanation need not be sound, fair, or correct, but only colorable enough that a rational jury could believe it to have been the employer's true motivation. (See *Guz, supra,* 24 Cal.4th at p. 358.) Of course, evidence that the explanation was trumped up or is "unworthy of credence" will tend to support a finding that the action was actually motivated by discriminatory animus, but the burden remains squarely on the plaintiff to convince a jury of that fact by a preponderance of the evidence. (*Id.* at pp. 356, 361, 363.)

[13] We note that on this record the *only* conduct by plaintiff sustainable as a reason for his dismissal was his confrontation with Juarez on trying to reenter the store immediately after his shift ended. The other grounds now suggested by Safeway—insubordination, intoxication, and profanity—cannot be sustained as explanations for Hollis's decision. First it is far from clear that she relied on anything other than his supposed "push[ing]" of Juarez in deciding to terminate him. Second, there is no evidence that any of his other conduct was sufficient to warrant dismissal. Hollis testified that an appropriate response to employees' use of profanity was to "verbally counsel them." Safeway's policies and procedures prohibit "consumption of alcohol on store premises, [and] reporting to work under the influence of . . . alcohol," but are silent, as is the record as a whole, concerning intoxication on the premises while off duty. As for Safeway's latter-day claim of insubordination, we note that Demarest claimed only to have

finding that *her* motive was not discriminatory, but disciplinary, growing out of plaintiff's own conduct on May 31, 1998, which she believed included a battery on Juarez. Limited as it is to the motives of Hollis, however, this showing fails to establish an entitlement to summary judgment for reasons similar to those set forth in the previous section: Safeway has failed to make a threshold showing that *all* material contributors to the decision acted for legitimate nondiscriminatory motives. Nor has defendant shown that plaintiff cannot present sufficient proof to establish that retaliatory animus on the part of one or more contributors to the decision was a substantial contributing factor in bringing about his dismissal. Rather, the evidence of record raises triable issues of fact concerning the role and motives of these additional actors.

### B. *Cat's Paw*

As previously noted, ignorance of an occasion for retaliation can only constitute a defense as to those actors who were in fact ignorant of the plaintiff's protected activities. Similar principles apply to characterizing an action as resting on a discriminatory or nondiscriminatory motive. To establish an entitlement to judgment as a matter of law, it is not enough to show that one actor acted for lawful reasons when that actor may be found to have operated as a mere instrumentality or conduit for others who acted out of discriminatory or retaliatory animus, and whose actions were a but-for cause of the challenged employment action. If a supervisor makes another his tool for carrying out a discriminatory action, the original actor's purpose will be imputed to the tool, or through the tool to their common employer.

The clearest explication of this concept was provided by Judge Posner in *Shager, supra,* 913 F.2d 398. The district court there granted the employer's motion for summary judgment, in part because the plaintiff had been discharged by decision of a "Career Path Committee," whose members did not appear to have acted with discriminatory animus. In reversing, Judge Posner wrote that the committee's decision to fire the plaintiff did not necessarily insulate the employer from the age-related animus exhibited by the plaintiff's supervisor Lehnst; rather the decision "was tainted by Lehnst's prejudice" because he "not only set up Shager to fail by assigning him an unpromising territory but influenced the committee's deliberations by portraying Shager's performance to the committee in the worst possible light." (*Id.* at p. 405.) In language with distinct parallels to the facts a jury might find here, Judge Posner explained further: "Lehnst's influence may well have been decisive. The committee's deliberations . . . were brief, perhaps perfunctory; no member who was deposed could remember having considered the issue. A

---

"asked" plaintiff not to frequent the store after his shift, and plaintiff testified that he was told only that he "should not stay too long."

committee of this sort, even if it is not just a liability shield invented by lawyers, is apt to defer to the judgment of the man on the spot. Lehnst was the district manager; he presented plausible evidence that one of his sales representatives should be discharged; the committee was not conversant with the possible age animus that may have motivated Lehnst's recommendation. *If it acted as the conduit of Lehnst's prejudice—his cat's-paw—the innocence of its members would not spare the company from liability.* For it would then be a case where Lehnst, acting within (even if at the same time abusing) his authority as district manager to evaluate and make recommendations concerning his subordinates, had procured Shager's discharge because of his age. Lehnst would have violated the statute, and his violation would be imputed to [the employer]. The committee would be out of the picture." (*Ibid.*, italics added; see *id.* at p. 406 [supervisor's conduct could be found willful for purposes of extended statute of limitations, and could be imputed to employer if committee operated to "rubber stamp personnel actions" by supervisors; question for trial was whether committee was a "mere rubber stamp," or "made an independent decision"].)

The Supreme Court cited *Shager* with approval in *Burlington Industries, Inc. v. Ellerth* (1998) 524 U.S. 742, 762 [141 L.Ed.2d 633, 118 S.Ct. 2257]. Moreover, in *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 151–152 [147 L.Ed.2d 105, 120 S.Ct. 2097], the court substantially adopted such a theory, holding that an employer was not entitled to judgment as a matter of law where a discharged worker presented evidence of age-based animus on the part of his supervisor and where, although the decision to terminate was made by the company president (the supervisor's wife), the supervisor could be found principally responsible for the decision. The "cat's paw" model, or a functional equivalent, has also been adopted or referred to approvingly in all but one of the federal circuits.[14] (See *Griffin v.*

---

[14] The term "cat's paw," in this context, is apparently traced to Aesop: "A cat and a monkey were sitting one day in the chimney corner watching some chestnuts which their master had laid down to roast in the ashes. The chestnuts had begun to burst with the heat, and the monkey said to the cat, 'It is plain that your paws were made especially for pulling out those chestnuts. Do you reach forth and draw them out. Your paws are, indeed, exactly like our master's hands.' The cat was greatly flattered by this speech, and reached forward for the tempting chestnuts, but scarcely had he touched the hot ashes than he drew back with a cry, for he had burnt his paw; but he tried again, and managed to pull one chestnut out; then he pulled another, and a third, though each time he singed the hair on his paws. When he could pull no more out he turned about and found that the monkey had taken the time to crack the chestnuts and eat them." (Fables from Aesop (1909) at <http://fairytales4u.com/fable/fable2.htm> (as of July 26, 2004).) We note, however, that the term has a second meaning of relevance in this context: a particular carpenter's tool used to extend the reach when pulling nails. (Ettlinger, Homeowners Menagerie (2004) at <http://www.thisoldhouse.com/toh/knowhow/tools/article/0.16417.213940.00.html> (as of July 28, 2004).) Thus while the fable contemplates that the instrumentality has been duped or flattered into carrying out the will of the actuator, the concept here is broader: Imputation of retaliatory animus will be justified by any set of facts

*Washington Convention Center* (D.C. Cir. 1998) 142 F.3d 1308, 1310, 1312 [prejudicial error to exclude evidence of bias on part of immediate supervisor who "participated at every stage of the process that led to [plaintiff's] termination"; "we join at least four other circuits in holding that evidence of a subordinate's bias is relevant where the ultimate decision maker is not insulated from the subordinate's influence"]; *Santiago-Ramos v. Centennial P.R. Wireless Corp.* (1st Cir. 2000) 217 F.3d 46, 55 [one way to show pretext "is to show that discriminatory comments were made by the key decision-maker or those in a position to influence the decisionmaker"]; *Gierlinger v. Gleason* (2d Cir. 1998) 160 F.3d 858, 872–873 [supervisor liable if his recommendations and actions proximately led to plaintiff's ultimate discharge and were "substantially motivated" by retaliatory animus]; *Abrams v. Lightolier, Inc.* (3d Cir. 1995) 50 F.3d 1204, 1214 [evidence of supervisor's discrimina-tory animus was properly admitted and supported verdict for plaintiff where evidence supported finding that supervisor "played a role" in decision to discharge]; *Russell v. McKinney Hosp. Venture* (5th Cir. 2000) 235 F.3d 219, 226 ["[i]f the employee can demonstrate that others had influence or leverage over the official decisionmaker, and thus were not ordinary coworkers, it is proper to impute their discriminatory attitudes to the formal decisionmaker"], citing *Long v. Eastfield College* (5th Cir. 1996) 88 F.3d 300, 307, fn. 8, 308–309 [error to grant summary judgment based on college president's nondiscriminatory motive, where trier of fact could find that president "rubber stamp[ed]" supervisors' retaliatory recommendations to discharge plaintiffs for supposed misconduct]; *Christian v. Wal-Mart Stores, Inc.* (6th Cir. 2001) 252 F.3d 862, 877 [discriminatory eviction from store; following cases "in which an employee challenges his termination as improperly motivated by a supervisor's discriminatory animus and then seeks to impute that animus to the neutral decisionmaker who ultimately terminated the employee"]; *Rogers v. City of Chicago* (7th Cir. 2003) 320 F.3d 748, 754 ["if there were competent evidence that the Personnel Division had acted as [supervisor's] 'cat's-paw' and rubber-stamped his recommendation, we would consider [supervisor] to be the decisionmaker"]; *Kientzy v. McDonnell Douglas Corp.* (8th Cir. 1993) 990 F.2d 1051, 1060 [immediate supervisor's discriminatory investigation and referral to disciplinary committee was suffi-cient to support judgment for discharged worker]; *Bergene v. Salt River Project Agr. Imp. and Power* (9th Cir. 2001) 272 F.3d 1136, 1141 ["Even if a manager was not the ultimate decisionmaker, that manager's retaliatory motive may be imputed to the company if the manager was involved in the hiring decision"][15]; *English v. Colorado Dept. of Corrections* (10th Cir. 2001)

that would permit a jury to find that an intermediary, for whatever reasons, simply carried out the will of the actuator, rather than breaking the chain of causation by taking a truly independent action.

[15] The Ninth Circuit explicitly endorsed the cat's paw model in *Pacheco v. New Life Bakery* (9th Cir. 1999) 187 F.3d 1055, 1060, but then declared that opinion "withdrawn" upon

248 F.3d 1002, 1011, bracketed material in original [to recover under cat's paw theory, plaintiff "must show 'that the decisionmaker followed the biased recommendation [of a subordinate] without independently investigating the complaint against the employee' "]; *Llampallas v. Mini-Circuits, Lab, Inc.* (11th Cir.1998) 163 F.3d 1236, 1249 ["[i]n a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers"].)[16]

■ We have no doubt that California law will follow the overwhelming weight of federal authority and hold employers responsible where discriminatory or retaliatory actions by supervisory personnel bring about adverse employment actions through the instrumentality or conduit of other corporate actors who may be entirely innocent of discriminatory or retaliatory animus. We now consider the application of these principles to the facts of record.

### C. *Application*

The situation here is more complicated than in *Shager* because the process leading to plaintiff's dismissal involved not two principal actors but four: Juarez, who reported the May 31, 1998 confrontation with plaintiff as a battery; Demarest, who reported the incident to security as an instance of "possible workplace violence"; Harrison, who conducted an investigation of the incident; and Hollis, who adopted Harrison's recommendation and formally discharged plaintiff. To establish an entitlement to judgment Safeway had to address the conduct, role, and motives of each of these actors; instead it addressed only the role and motives of the last, Hollis. This showing was arguably insufficient to carry Safeway's threshold burden on summary judgment, because it failed to show that "the employer" acted for a legitimate nondiscriminatory reason or that plaintiff could not prove otherwise. However, even if Safeway is assumed to have carried its moving burden, thereby shifting the burden to plaintiff to raise one or more material triable issues of fact, we find that the record does raise such issues because it justifies an inference that lower level actors engaged in retaliation under circumstances justifying an imputation of their conduct and motives to Safeway.

We address the role of the first actor, Juarez, only in passing, because neither party has directed any attention to the question of whether her

---

settlement of the parties. (*Pacheco v. New Life Bakery* (9th Cir. 1999) 187 F.3d 1063, 1064.) The opinion remains on the books, but is presumably not binding on the court that rendered it.

[16] The Fourth Circuit may be understood to have rejected the theory, or restricted it to arguable invisibility, in *Hill v. Lockheed Martin Logistics Management, Inc., supra,* 354 F.3d at pp. 282–285, 290–291 (en banc), reversing *Hill v. Lockheed Martin Logistics Management, Inc.* (4th Cir. 2003) 314 F.3d 657, 659. We find the analysis in that case unpersuasive, and decline to intrude on its splendid solitude.

position would justify an imputation of her motives to Safeway. (See fn. 9, *ante*.) We note only the bare possibility that she may have occupied some sort of supervisory role, and might be found to have engaged in retaliation, as suggested by Stephanie Alves's listing of Juarez among the coworkers by whom she had been sexually harassed at Safeway. Another employee testified that a few days after the incident, when he asked Juarez what had happened, and whether "Bill had pushed her or knocked her down," she replied, " 'He touched me, and that's all there is' or 'all it takes.' "

Whatever the role of Juarez may have been, the evidence presents ample basis for finding retaliatory motives and conduct on the part of plaintiff's unquestioned supervisor, Demarest. There is evidence that Demarest resented and opposed plaintiff's efforts to secure relief for the women in the store from what plaintiff believed (with the agreement of at least some of them) was a pattern of sexual harassment. Demarest did not relay these complaints to human resources (as Hollis said he should have done), but professed to have conducted an investigation of his own (as she said he should *not* have done). A jury could doubt the zeal and sincerity with which the investigation was conducted, and even question whether it occurred, given Demarest's denial that anyone corroborated plaintiff's complaints—a denial which stands in stark contrast to Stephanie Alves's testimony that she directly complained to Demarest, with no discernible effect. The record contains other evidence that Demarest showed insensitivity, at best, to matters of gender: He assigned a female worker to paint the men's room, and he made comments to two other female workers that they found overly personal and offensive—telling one that she "needed to start working out" and that he was going to pull out all her gray hairs.

Further, Demarest's conduct following receipt of Juarez's report could be found to be retaliatory in character. Although he apparently had ample time and opportunity to speak to plaintiff about the underlying incident, he did not do so. Instead he acted entirely on the basis of accounts from Juarez and Sparks, each of whom had a reason—which could well have been readily apparent to Demarest—to portray plaintiff's conduct "in the worst possible light." (*Shager, supra,* 913 F.2d at p. 405.) Citing only their version of events, Demarest referred the matter to security rather than to the human resources department, characterizing the incident as "possible workplace violence" and "obviously a security issue."

Finally there is substantial evidence that Demarest knew such a referral was substantially certain to result in the dismissal of a 29-year veteran employee. He testified that every case he ever referred to security resulted in dismissal where it involved "an allegation of improper conduct" comparable

to the allegations against plaintiff.[17] A fact finder could also draw an adverse inference (see Evid. Code, § 412) from his arguably pointed evasion of the direct question whether he expected the referral in this case to result in plaintiff's termination.[18]

This brings us to the third actor, Harrison. Again the record is devoid of direct evidence that he acted without retaliatory motive. The record includes no testimony by him concerning his reasons for recommending that Hollis dismiss plaintiff. Defendant made some attempt to establish as an undisputed fact that Harrison was unaware of plaintiff's protected activities, but the attempt failed. Harrison's only positive denial of knowledge in deposition concerned awareness that plaintiff had complained *about Sparks*, and even that testimony could be found both equivocal and controverted. When asked whether he recalled plaintiff speaking of "complaints by a woman of sexual harassment describing a sniffing incident," Harrison replied, "No. [¶] . . . [¶] Sniffing, no." Asked whether he recalled plaintiff mentioning that he had complained about Sparks's behavior, Harrison said, "No. I don't recall that." His memory also failed him with respect to why his file on plaintiff's case contained a copy of "the corporate policy on the prevention of sexual harassment that is signed by Bill Reeves."

Likewise Harrison acknowledged that he probably asked plaintiff whether he "ha[d] anything against any individuals," or thought "anyone doesn't like you." Harrison could not recall plaintiff's answers, and when he was specifically asked in deposition whether plaintiff "mention[ed] anything about [sexual harassment]," he seemed uncertain or evasive, replying, "I'm trying to recall. He mentioned something about pulling the girls' hair, and that's what kind of stuck in my mind. And I didn't know if that was a physical situation or a description that he was using." Either way, of course, the phrase may be found to suggest either an incident or an ongoing course of sexual harassment.

---

[17] Demarest testified as follows:

"Q. Have you ever referred a matter to security during your tenure at Store 741 which involved stealing or an allegation of improper conduct, such as that concerning Mr. Reeves or Mr. Prodes, and not had the referral to security result in the termination of the employee complained about?

"A. No"

[18] "Q. When you referred this matter to security, did you understand that this would likely result in the termination of Mr. Reeves' employment with Safeway?

"A. Are you saying did I think he was going to be terminated; is that the question?

"[Question read back.]

"THE WITNESS: No.

"Q. Why not?

"A. I don't make those decisions."

While Harrison's deposition testimony on these matters may support conflicting interpretations, "the task of disambiguating ambiguous utterances is for trial, not for summary judgment." (*Shager, supra,* 913 F.2d at p. 402.) Further, a fair reading of plaintiff's testimony indicates that he *did* tell Harrison about the sexual harassment complaints. He testified that during the interview he was asked "why Brian [Sparks] or . . . Sandy [Juarez] would lie about it, would lie about what happened. Would they have any reason to lie about what happened." In response he told the investigators "that there had been some problems in the store. Some complaints of sexual harassment, especially the incident involving Stephanie, the sniffing incident . . . which happened . . . January the 18th. But there had been other continuing problems that I thought might have a bearing on it." Asked again whether he "provide[d] them with some explanation as to why [he] believed these two other witnesses were possibly lying," he said, "I knew that there was a lot of resentment by Sparks for me after I had complained to [*sic*] him and after Sparks had apologized to the four females in the store for having harassed them. . . ." Asked yet again whether he "relay[ed] this information to the two investigators at that meeting," he replied that "[t]he subject of Sparks did . . . come up . . . and the subject of Steve Prodes came up."

Read most favorably to plaintiff, as is required on summary judgment, this evidence raised a triable issue of fact as to whether plaintiff told Harrison about the complaints of sexual harassment plaintiff had relayed to Demarest. Defendant made no affirmative showing to the contrary. Nor did it attempt to show that Harrison acted for honestly held nondiscriminatory reasons, and even if it had, the evidence supports an inference that Harrison acted as a sort of institutionalized "cat's paw" to effectuate the retaliatory intentions of supervisors by substantiating their claims of misconduct and presenting the claims, thus reinforced, to upper management.

The evidence supports an inference that Harrison's investigation of the alleged misconduct was not truly independent, but was heavily skewed to favor the ostensibly tentative conclusions of the reporting supervisor, Demarest. Describing his general role in deposition, Harrison hypothesized a situation where two employees are arrested in the act of stealing and stated, "I know [when] dealing with Ms. Hollis . . . , if *we have a case that solid* termination is inevitable." (Italics added.) We note the contrast between this construction, which contemplates having a "solid case" against an employee, and a more neutral construction such as, "When the facts are that clear, dismissal is inevitable." A fact finder would be entitled to infer that an investigator who speaks and thinks in terms of "solid cases" against workers is revealing a predisposition to confirm disciplinary charges rather than objectively ascertain their truth. This in itself is not actionable, but it means that such an investigator is of necessity a cat's paw—a conduit for imputation

of discriminatory animus—as to any supervisor who wishes to discriminate against a worker by exploiting a disciplinary process predisposed to confirm all charges.

A fact finder could easily find that Harrison conducted just such a predetermined investigation. His report describes Juarez as "Victim"—not "complainant" or "accuser"—and plaintiff as "Suspect"—not "accused." Insofar as it concerns the all-important confrontation between Juarez and plaintiff, its purported "account of what . . . occurred" depends exclusively on the accounts of Juarez and Sparks—one of whom had committed herself to a claim of battery by attempting to escalate plaintiff's reentering the store into a police incident, and the other of whom had an obvious and substantial motive to wish plaintiff ill. Plaintiff's own account of the incident was relegated to a later section of the report describing his "interview" by investigators. In short, plaintiff's account is presented as a story, while the Juarez/Sparks version is presented as history.

Further, in describing plaintiff's account Harrison uses vaguely disparaging language, stating most strikingly, "Reeves *claimed* that he had an attack of diarrhea due to medication he was taking." (Italics added.) In an appendix to the report Harrison attempted to debunk this "claim" on grounds a fact finder could find highly conjectural and partisan.[19]

Moreover, Harrison could be found to have presented plaintiff's "case" to Hollis in a highly unbalanced way, making it appear "solid," largely by failing to tell her about the numerous potential ameliorating circumstances. These included plaintiff's claim of an urgent biological necessity for reentering the store, the potential reasons for Sparks and Juarez to exaggerate plaintiff's conduct, and the presence at the store of a claimed atmosphere of sexual harassment that might have colored the decision of the complaining supervisor, Demarest, to treat plaintiff's conduct as an issue for security rather than for human resources.

More basically, and in marked contrast to Harrison's searching examination of plaintiff's excuse for re-entering the store, there is no evidence that he ever questioned Demarest's view that the incident was a case of "workplace violence." Indeed there is no evidence that he thought it was his function to do so—or for that matter, to investigate exculpatory information of any kind.

---

[19] Harrison suggested that (1) the prescription on which plaintiff blamed the diarrhea should have been used up by May 25, and any such side effect "should [have] disappeared" within a "few days" thereafter; and (2) plaintiff may have been in the store as briefly as five minutes, which "does not appear to be sufficient time for Mr. Reeves to use the restroom." A fact finder could find these suppositions and deductions so dubious as to cast doubt on Harrison's objectivity, particularly since Juarez told him that plaintiff was in the store for "around 10 min[utes]." The report contains no indication that Harrison had even asked other witnesses whether, for instance, they saw plaintiff enter or emerge from the restroom.

A jury could find a telling lack of thoroughness in the fact that, for all the time that passed between the incident and Harrison's call to Hollis, two witnesses who gave exculpatory testimony in deposition were never interviewed.[20]

A fact finder could conclude that Harrison saw his function not as gathering objective evidence to pass to Hollis but as lending credence to Demarest's report that "workplace violence" had occurred. From this it follows that whether or not Harrison personally felt retaliatory animus towards plaintiff, the purpose and effect of his involvement was merely to effectuate the will of Demarest. He made himself a tool, witting or unwitting, for a supervisor who might wish, as Demarest could be found to wish, to retaliate against workers for protected activities.

We emphasize that our analysis is confined to evaluating inferences which *may*, but need not, be drawn from this record. It is not for us to say whether they represent the best or only inferences. Our task must end with the conclusion that they are inferences a reasonable factfinder could draw. Here a rational fact finder could conclude that an incident of minor and excusable disregard for a supervisor's stated preferences was amplified into a "solid case" of "workplace violence," and that this metamorphosis was brought about in necessary part by a supervisor's desire to rid himself of a worker who created trouble by complaining of matters the supervisor preferred to ignore.[21] Since those complaints were protected activities under FEHA, a finder of fact must be permitted to decide whether these inferences should in fact be drawn.

DISPOSITION

The judgment is reversed.

Premo, J., and Elia, J., concurred.

---

[20] Harrison never talked to Wayne Kenney, who testified that Juarez told him, "He [defendant] touched me, and that's all there is," or perhaps, "all it takes." Nor did anyone ever talk to Bill Dupre about the events of the next morning, when contrary to the reports of certain other workers, he detected no alcohol on plaintiff's breath or other signs of alcohol ingestion.

[21] In view of our analysis we find it unnecessary to consider plaintiff's argument that the inadequacies in Safeway's investigation are evidence of pretext, by extension of the holding in *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 107–108 [69 Cal.Rptr.2d 900, 948 P.2d 412].