Filed 2/7/14  De Jardin v. Kindred Healthcare Operating CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RASSI DE JARDIN, | |
| Plaintiff and Appellant, | G047580 |
| v. | (Super. Ct. No. 30-2011-00516947) |
| KINDRED HEALTHCARE OPERATING, INC.,  et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Steven Siefert, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Reversed in part, affirmed in part.

Ames Law Office and Douglas A. Ames for Plaintiff and Appellant.

Alston & Bird, Martha S. Doty and Sayaka Karitani for Defendants and Respondents.

\*          \*          \*

Rassi de Jardin was fired for alleged sexual harassment. He claims the sexual harassment charge was a pretext to get rid of him for having given adverse testimony in a previous investigation of his supervisor's protégé. The trial court granted summary judgment to De Jardin's former employer, Kindred Hospital, on the ground there was no causal link between the supervisor's animus and De Jardin's firing. We disagree and reverse that aspect of the judgment.

The standard of review governing summary judgment motions requires that all conflicts and inferences must be drawn in favor of the responding, not moving party. Under that standard of review, we find substantial evidence of a causal link between the supervisor's animus and De Jardin's termination. That evidence includes:

(a) evidence of the supervisor's displeasure with De Jardin's testimony in the previous investigation combined with his substantial role in the investigation of the sexual harassment complaint against De Jardin, which allowed him to put De Jardin in the worst possible light (*Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 113 [reversing summary judgment where supervisor with retaliatory animus was able to steer investigation of alleged misconduct to put employee in worst possible light]); and

(b) the expansion of the investigation of the single sexual harassment complaint made against De Jardin – without any notice to him – into a general fishing expedition looking for any arguable sexual harassment charges that might be lodged against him. (*Yanowitz v. L'Oreal* (2005) 36 Cal.4th 1028, 1039-1040, 1055 [reversing summary judgment where management actively solicited negative information against employee who had refused to implement discriminatory firing of subordinate].)

There may be perfectly good explanations for these and other things we discuss below – we take no position on the ultimate resolution of this dispute – but they are explanations that should be tendered to a trier of fact.

2

## I.  FACTS

A.  *Standard of Review*

"Because we review this matter after summary judgment was entered in favor of [the employer], we consider the facts most favorably to plaintiffs.  We liberally construe plaintiffs' evidentiary submissions, strictly construe the evidence submitted by [the employer], indulge all reasonable inferences in support of plaintiffs, and resolve all evidentiary doubts or conflicts in favor of plaintiffs."  (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 274, fn. 2.)

B.  *Events at Kindred Hospital in the Summer of 2011*

In May 2011, Rabin Kazemi, a respiratory therapist at Kindred Hospital in Westminster, complained to the director of the respiratory therapy department, Lito Cabra, about ethnic slurs made against him by Michael Gordon, another respiratory therapist.  Cabra initiated an investigation by contacting Maria Laureano, a human resources advisor.  Laureano and Cabra then called in various witnesses to investigate the complaint against Gordon.  Plaintiff Rassi De Jardin was the first witness in the hospital's investigation.  Perceiving a close relationship between supervisor Cabra and the accused Gordon, De Jardin was reluctant to testify and in fact told Laureano of his reluctance.  Gordon had been a protégé of Cabra's.  Cabra had been responsible for promoting Gordon, and the two had been on sufficiently friendly terms that they had been overheard discussing Cabra's sex life.

Despite his misgivings about offending Cabra, De Jardin gave evidence unfavorable to Gordon.  At the time De Jardin gave his testimony, Cabra seemed "really, really upset."  The change in his demeanor in reaction to De Jardin's testimony was perceptible.  Going into the meeting at which De Jardin testified, Cabra had seemed relaxed and comfortable with De Jardin.  But after the meeting, Cabra avoided all eye contact with him.  Gordon was suspended immediately and soon terminated.  Gordon

3

blamed De Jardin for his termination and sent him a series of angry text messages to that effect.

At his deposition in this case, De Jardin was very clear that he complained to Maria Laureano the human resources officer in June and July about Cabra's attitude toward him. Laureano responded to De Jardin's complaint about Cabra by telling him there was nothing to be done "until anything happened," and she reassured him "it should just pass." De Jardin didn't believe he could go to anyone else but Laureano because she was the "HR person to who I could address my concerns."

Immediately after De Jardin's adverse testimony against Gordon, Cabra (who normally worked daylight hours) began calling De Jardin (who worked nightshift hours) in for meetings during daylight hours about "every charting." This happened on "multiple occasions" following the testimony against Gordon. The net effect was to seriously disrupt De Jardin's sleep patterns. The inconvenient meetings continued through the summer of 2011, even though De Jardin received a formal performance review from Cabra recognizing De Jardin exceeded standards of professionalism.

On August 2, 2011, about 10 weeks after De Jardin's testimony against Gordon, a nurse's assistant named Sandra Barragan complained that De Jardin had sexually harassed her on the previous night's shift, including attempting to kiss her. Barragan had reason to fabricate a sexual harassment claim. She had been facing discipline for having come to work under the influence of crystal meth, and for accumulated absences and tardiness, but had been overheard to say that if she presented a sexual harassment claim, "they" would "never fire" her. But the hospital, quite rightly, looked into her complaint.

An investigation committee was assembled that very morning. At the beginning, the committee consisted of human resources advisor Laureano and Cabra. Laureano initially asked nurse supervisor Ryleen Granada-Madrigal to join the panel, but Granada-Madrigal begged off, asserting she herself had been "sexually harassed" by De

4

Jardin back in early 2010.  Instead, nursing manager Charlotte Cook was brought into the committee.

The basic narrative of their interview of De Jardin is this:  After having worked 12 hours, De Jardin went home to sleep.  A few hours later, around 10 in the morning, he got a call from Laureano requesting he come to her office around 2 p.m.  The call woke him up.  He was exhausted from the previous evening's work, but the call from Laureano prevented him from getting any more sleep in the interim.  At his interview De Jardin was asked about his conduct with Barragan in detail.  He categorically denied any harassment.

De Jardin might – or might not – have been asked about whether he had harassed any other nurses.  At one point in his deposition in this case he gave an affirmative answer as to whether he was asked by Laureano or Cook if he had acted similarly toward other nurses as he had acted toward Barragan.  But the context of his answer to the next question – he spoke exclusively of what he had been asked about Barragan – and his subsequent statement that he didn't remember being so asked, but if he had been so asked would have denied any such behavior – suggests he had a mistaken understanding of the question, i.e., in the investigation he was only asked about Barragan and not whether he had harassed other nurses.

However, *even if* De Jardin was asked whether he had harassed other nurses, there is no evidence in this record that he was asked about any specific incidents of possible harassment related to the committee by Granada-Madrigal or nurses Jennifer Tanqueco, Darlene Villaber, or Conchita Somido.  And there appears to be an obvious reason for the lack of any such specific questions:  Those four individuals had never complained of any sexual harassment by De Jardin, and had *yet* to be interviewed by the committee, so the committee would have had no basis for such questions.  At the end of the August 3 interview, De Jardin was suspended by Laureano.

5

Laureano's committee soon interviewed Granada-Madrigal and the three other nurses just mentioned – Tanqueco, Villaber and Somido – whose names Granada-Madrigal had given the committee. The committee solicited these interviews, and there is no evidence in the record to suggest that any of these four had ever complained about sexual harassment by De Jardin in the past.

But there were two other interviews as well, of nurses whose names De Jardin had given as present on the night shift when he allegedly harassed Barragan: Ofa Motuahala and Meschelle Ahmed. Neither had previously ever come forward to complain of any conduct by De Jardin. Motuahala told the committee she saw nothing untoward between De Jardin and Barragan, but she didn't listen in on conversations between coworkers. Ahmed specifically told the committee about Barragan's alleged problems with crystal meth and Barragan's comment that a sexual harassment complaint would mean "they will never fire me." To the degree that Motuahala or Ahmed, the two interviewees who might have seen or heard any harassment of Barragan by De Jardin provided any information to the committee, it tended to exonerated De Jardin. Neither said they saw or heard any untoward behavior or words on De Jardin's part.

The four other nurses, however, described incidents dating from years previous suggesting, at the very least, that De Jardin had been too familiar with them. By August 5, Laureano had prepared a formal memo to Jeffrey Sopko, Kindred's regional human resource director, the core of which was that De Jardin had sexually harassed nurses Granada-Madrigal, Somido, Villaber and Tanqueco.[1]

---

[1]    This is a summary judgment case, the responding party therefore receives the benefit of all inferences and conflicts. Accordingly, we do not, *in this context*, go so far as to label those previous incidents as "sexual harassment." That's a legal conclusion, which would require development on a more complete record and, more importantly, since De Jardin categorically denied such behavior *at his deposition*, the conflict is resolved in his favor for purposes of this appeal.

Here is what those four nurses reported to the investigation committee as described in the committee's own report. Again we remind readers that since De Jardin flatly denied any such behavior, the question of whether these incidents actually happened, or happened as egregiously as the report describes them, is resolved in De Jardin's favor;

Concerning Barragan, however, the memo's finding was that "Since there were no witnesses we were not able to validate Sandra's story." So the initial complaint was never substantiated. Moreover, while nurse Ahmed had provided Kindred with information concerning Barragan's motive to lie about sexual harassment (her "they will never fire me" comment), that information did *not* make it into Laureano's report.

Despite its omission from Laureano's report, Sopko was aware of nurse Ahmed's allegations concerning Barragan. However, in evaluating Laureano's report, Sopko discounted the evidence of Ahmed, the nurse who recounted Barragan's statement a sexual harassment claim would give her immunity from firing, because he thought Ahmed and De Jardin had some sort of relationship which might cast doubt on her story – a belief he admitted was "speculation and conjecture" on his part.

---

Nurse Conchita Somido said that sometime in early 2010 De Jardin said something to her the effect of which was "Oh baby you're hot today" and "would ask [her] to go out." She replied she was married, and it was not nice or ethical to ask such questions. Somido also overheard De Jardin speaking about a girl he dated and "how hot she was" and that the two of them "did it." Somido told De Jardin "not to talk in the unit about that kind of stuff." Laureano's memo does not contain any evidence that De Jardin continued to talk about inappropriate subjects with Somido after her admonition to him to stop.

Nurse Darlene Villaber said some six months prior to her interview De Jardin "would joke and say can we go on a hot date," which he did both while they were alone and while other "people were around." Also, once he walked into the nurses lounge and hugged her, which made her feel uncomfortable, and she asked him to "stop it." The memo also related how the husband of an unnamed coworker "showed up . . . looking for his wife who was rumored to be having an affair with" De Jardin. After that Villaber stopped talking to De Jardin.

Nurse Jennifer Tanqueco related that she "used to car pool" with De Jardin, in the process of which he told her "he likes to go for married women and he wants relationships with women who are married." She overheard him asking (unnamed) coworkers "to go out on dates," and would "joke with the girls and used nasty words," which she didn't like. She also "overheard him asking another nurse for a kiss and hug," because apparently "he likes to hug." And De Jardin would sometimes come to the east wing of the hospital when he was assigned to the west wing, and "follow from room to room one of the nurses." And Tanqueco "overheard laughter coming from the dictation room" where De Jardin was with two other nurses, one of whom said "that's disgusting." When Tanqueco asked what the commotion was about the "nurse told her that [De Jardin] showed them a picture of his private parts" on his "cellphone/ipod."

Laureano's memo also recounted that Ryleen Granada-Madrigal was initially asked to be involved as an investigator in the De Jardin investigation, but declined because "she didn't think it was appropriate as [she] was sexually harassed by [De Jardin] when she was working as a RN nights" in the hospital's west wing in early 2010. In her role as witness, as distinct from potential investigator, Granada-Madrigal "claim[ed]" that "occasionally [De Jardin] would flirt," [¶] say "'I would like to take you out if you weren't married,'" [¶] "you're so pretty," [¶] "brag about dates" and "share details of sexual encounters." However, Granada-Madrigal also said De Jardin's "behavior with her stopped when she told him my husband is big and he's going to kick your ass if you don't stop." Granada-Madrigal also provided the "names of nurses who witnessed his behavior or had themselves experienced sexual harassment."

7

Other than Sopko's supposition, however, the hospital presented no evidence in its motion for summary judgment that Ahmed and De Jardin actually had any "relationship" other than as coworkers, and in fact each of them would later submit declarations opposing Kindred's summary judgment motion averring there was no collusion between them.

The manager who actually made the decision to fire De Jardin was not Sopko, but Kathryn Ross, Kindred's chief clinical officer. There is evidence that Ross was exposed to lobbying from Cabra. Ross admitted at her deposition she talked to Cabra about De Jardin's firing. Cabra had been on the committee which uncovered the allegations of harassment from nurses who had never complained about De Jardin before. Cabra admitted at his own deposition he *told Laureano* that "half of the time" De Jardin was only "kidding," – indicating, of course, that the other half of the time De Jardin wasn't kidding. Cabra further related *to Laureano* – in the presence of the other panelist, Cook – an experience "many years ago" in which De Jardin had allegedly felt Cabra's muscles. Cabra further admitted at his deposition that he agreed with the decision to terminate De Jardin because he was influenced by Tanqueco's evidence and because *he himself* had "noticed throughout the years with [De Jardin], that he is guilty of that, sexual harassment."

There were additional irregularities in the investigation. Cabra told Laureano about something that did not have anything to do with sexual harassment at all: that Gordon had said De Jardin himself, like Gordon, had uttered ethnic slurs against Kazemi. However, when Kazemi's deposition was finally taken, Kazemi was unequivocal that De Jardin had never uttered any racial slurs against him.

Another irregularity was that notes of original interviews taken by Cook were discarded or destroyed. Laureano excluded from her report exculpatory evidence received from one of the nurses, Darlene Villaber (to whom the report attributed adverse statements about De Jardin) to the effect De Jardin's hugs were done in a friendly

8

manner. On summary judgment we must draw the inference that Villaber might have indicated to the committee that De Jardin had been perhaps overfamilar, but Villaber did not initially think his conduct rose to level of actual sexual harassment. And finally, one of the notes taken by Laureano of the interview with Ahmed – the witness who was omitted from Laureano's report and who was generally favorable to De Jardin – may have had words whited out in it.[2]

C. *De Jardin's Termination and Subsequent Litigation*

Among the items of evidence before the court on the summary judgment motion was Kindred's own employee handbook. The handbook says that except for cases of "serious misconduct or serious job performance deficiencies . . . we take a performance improvement and progressive correction approach," which escalates from verbal counseling to written warnings to disciplinary suspensions and finally separation from employment. There was no progressive correction for De Jardin, however. He was soon fired. At his termination interview, Cabra looked into De Jardin's eyes, smiled, and, as De Jardin later testified at his deposition, asked De Jardin: "who do I think my enemy on the day shift" is. The comment would later be taken by De Jardin as confirmation of Cabra's ongoing hostility arising from De Jardin's role in the Gordon investigation.

---

[2]    Here's our best attempt to reproduce in print what the note reads like. The material in brackets is our guess of characters that border on illegibility. The "footnotes" that appear are not footnotes, just numbers inserted in the writing, and we reproduce those numbers as close as we can to the way the actual document appears in our record:

Dictation room 2 weeks ago (Meschelle)3  people
Karl he's aggressive
          [illegible] phone number                                    Sol
2 weeks      always went [want?] to smoke with see [me?]
              might get on [looks like reprints]  makes me feel
                                                            4   uncomfortable
[illegible]          RDI[?]      if I report me of
                              *harassment they will*
                              never fire me

Within three months of his termination, De Jardin brought this action against Kindred Hospital (referred to in the briefs as THC[3]), Kindred Hospital's parent company (KHOI in the briefs) and Lito Cabra personally. Three causes of action were alleged: Retaliation, wrongful discharge because of the retaliation, and, with special reference to Cabra, breach of contract. The breach of contract action against Cabra is based on the allegation Cabra violated a confidentiality agreement signed at the beginning of the Gordon investigation by leaking De Jardin's role in the Gordon investigation to both Gordon himself and to Cabra's day shift coworkers.

After enough depositions had been completed to present a truly voluminous record, Kindred brought a summary judgment motion in June 2012. The motion was granted. The trial court concluded no evidence of pretext was shown, i.e., De Jardin did not have sufficient evidence of a "causal link between prohibited motivation and termination." In particular, the trial court seemed influenced by the evidence Cabra himself did not make the actual decision to terminate De Jardin and that grounds existed beyond Barragan's complaint on which to fire De Jardin: "The evidence in this case demonstrates that the hospital conducted an investigation, including several employees, and that the decisionmakers who approved plaintiff De Jardin's termination honestly believed that there had been a pattern of conduct on the part of plaintiff De Jardin, beyond just the conduct claimed by Ms. Barragan . . . ." The trial judge concluded Kindred had conducted a "balanced" investigation into the allegation against De Jardin. The trial court further concluded there was no evidence Kindred's parent (KHOI) controls Kindred's management decisions, and concluded KHOI should be dismissed for that reason. A timely notice of appeal was filed in October 2012, less than a month after the judgment.

---

3    More formally as THC-Orange County, Inc.

## III. DISCUSSION

A. *Shifting Burdens, The "McDonnell Douglas Quadrille"*
*and the Recent Harris Decision*

For about 40 years now, civil rights and retaliation cases have generally followed the shifting burden paradigm first outlined in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802-805. The shifting burden analysis has been likened to a game of "hot potato" (*Green v. Rancho Santa Margarita Mortgage Co.* (1994) 28 Cal.App.4th 686, 710) or a dance with carefully designed moves (*Shager v. Upjohn Co.* (7th Cir. 1990) 913 F.2d 398, 401 [referring to the "*McDonnell Douglas* quadrille"].) As most recently explained by our Supreme Court in *Yanowitz, supra,* 36 Cal.4th at page 1042, the paradigm plays out this way in retaliation cases: "Past California cases hold that in order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. . . . Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. . . . If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation."

In the present case, the first two figures of the quadrille are as good as danced: (1) De Jardin engaged in protected activity (his reluctant testimony in the Gordon investigation), he was fired, and Cabra's presence in the investigation which led to his firing shows a putative "causal link" between the testimony and the firing; and (2) clearly Kindred had a legitimate nonretaliatory reason to take an adverse action against De Jardin, i.e., alleged sexual harassment of other coworkers. Accordingly, under the *Yanowitz* standard, this appeal ultimately depends on the adequacy of De Jardin's next

11

step: showing a triable issue of fact as to whether Kindred intentionally retaliated against him for his earlier testimony.

But *Yanowitz* is not the last word from the Supreme Court on FEHA cases.[4] Since *Yanowitz* was decided, our Supreme Court has handed down *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, and *Harris* has made it clear the word "because" in these cases requires only that the jury conclude retaliation was "a substantial motivating factor" in the termination decision. The bottom line from *Harris* is that a plaintiff is within the statute if he or she shows that discriminatory animus was a "substantial motivating factor" in an adverse employment action. (*Id*. at p. 226.)

While *Harris* itself was a straight-on case of discrimination under section 12940, subdivision (a) of FEHA – a claim of pregnancy discrimination – there is no reason *Harris* should not also apply to retaliation cases under section 12940, subdivision (h) of FEHA. The only difference between subdivision (a) and subdivision (h) is that one (subdivision (a)) uses "because of" while the other (subdivision (h)) uses "because," and the difference is grammatically immaterial because the retaliation subdivision is framed in terms of a particular person who has done something (e.g., has filed a discrimination complaint) as distinct from more generic classification (e.g., fits into a category).

The *Harris* decision intimated that the traditional *McDonnell Douglas* paradigm – the highly stylized quadrille – was ill-suited to most civil rights cases as they are now litigated in the real world.[5] The *McDonnell Douglas* "framework," said *Harris*, "presupposes that the employer has *a single reason for taking an adverse action* against

---

[4]    Government Code section 12940 et seq. All statutory references in this opinion are to the Government Code.

[5]    A point adumbrated by our colleagues in the Sixth District in *Reeves,* supra, 121 Cal.App.4th at page 111, footnote 11. In comparing the *McDonnell Douglas* approach to what the *Harris* court would later describe as the "mixed motive" approach, Justice Rushing noted: "This model [mixed motive] presents its own perplexities – beginning with its label – but has the virtue of a more direct and logical method for the assessment of conflicting proofs of motive than has developed under what Judge Posner calls 'the *McDonnell Douglas* quadrille.'"

the employee and that the reason is either discriminatory or legitimate. By hinging liability on whether the employer's proffered reason for taking the action is genuine or pretextual, the *McDonnell Douglas* inquiry aims to ferret out the 'true' reason for the employer's action. In a mixed-motives case, however, there is no single 'true' reason for the employer's action." (*Harris, supra*, 56 Cal.4th at p. 215, italics added.)

In the real world, as *Harris* intimates, the employer always puts forth a "legitimate" reason for the action. If it does not, there is no defense. So virtually every case is a mixed motive case. The employer says the motive was legitimate, the employee says "No it wasn't; you had a wrongful motive." The jury can adopt either of those positions *or* decide there were mixed motives.

Under a *Harris* paradigm, then, we would conclude that this appeal turns on whether De Jardin showed a triable issue of fact as to whether retaliatory animus was *a* – meaning one of at least two – substantial motivating factor in his firing, as distinct from, under *Yanowitz*, whether he showed his firing was intentionally motivated by a desire to retaliate for his protected activity in testifying against Gordon.

But we need not go that far. To be clear, we conclude De Jardin showed a triable issue of fact as to whether Kindred intentionally retaliated against him, and his case survives summary judgment even under an *exclusively Yanowitz* analysis. *Yanowitz* itself, as we explain below, was also a case where summary judgment was *reversed* in circumstances analogous to this one. We need merely point out at this stage that if *Harris* were applied, it would confirm our decision. If there is any real difference between *Yanowitz's* proof of "intentional retaliation" and *Harris's* "substantial motivating factor" in a litigated adverse employment decision, the difference redounds to De Jardin's benefit.

B. *Triable Issue of Actionable Retaliation*

We believe De Jardin has presented evidence demonstrating a triable issue of fact of intentional retaliation under the *Yanowitz* standard, and, a fortiori, under the

13

*Harris* standard. De Jardin presented sufficient evidence on appeal to allow a jury to conclude Kindred fired him because Cabra steered the investigation of Barragan's complaint in a way to put De Jardin in the "'worst possible light.'" (See *Reeves, supra*, 121 Cal.App.4th at p. 113, quoting *Shager, supra*, 913 F.2d at p. 405.)

That evidence, construed in favor of the plaintiff, gives rise to a reasonably damning narrative. Cabra's body language when De Jardin testified against Gordon, coupled with Cabra's constant calling De Jardin in for meetings about "every charting" immediately after De Jardin's testimony, suggests retaliatory animus on Cabra's part. De Jardin's telling Maria Laureano in the summer months prior to Barragan's complaint about his concerns about Cabra's displeasure with his testimony in the Gordon investigation establishes that Laureano knew about Cabra's retaliatory animus.

Cabra's extensive role in the investigation of Barragan's complaint creates a reasonable inference he was able to implement his retaliatory animus in the course of that investigation, i.e., there was a causal link between the animus and the firing. Cabra acted as de facto witness, and communicated directly to the ultimate decisionmaker, Ross.

Pretext is found in the nature and conduct of the investigation itself. Barragan's charge could not be corroborated, and the allegation she came to work on crystal meth seriously undercut her credibility. Had the investigation stopped with Barragan, any grounds to discipline De Jardin, much less fire him, would be ephemeral. A reasonable trier of fact could find that the investigation was expanded so as to shore up a predetermined result – predetermined because Cabra wanted to be rid of De Jardin, not just see him warned. The inference of predetermination, i.e., pretext, is further strengthened by the absence of any notice to De Jardin. If the incidents related by Somido, Villaber, Tanqueco and Granada-Madrigal were fully investigated and De Jardin's side of the story were aired, it was possible that De Jardin might get off with

14

some lesser discipline than immediate firing, particularly given that none these incidents had ever before reified themselves into a sexual harassment complaint.

We have no idea whether any of these inferences holds up. But they seem to be sufficient to reach a factual determination.[6]

C. *Cases on Point: Reeves and Yanowitz*

1. *Reeves*

*Reeves v. Safeway Stores, supra*, 121 Cal.App.4th 95 is a case we cannot meaningfully distinguish from the one before us. We therefore discuss it at some length.

The plaintiff in *Reeves* worked at a grocery store. Female coworkers complained of sexual harassment at the store, and the plaintiff carried the complaint to the store manager. The store manager appeared to resent the information, tried to "'trivialize'" the matter by denigrating the complaint, and told the plaintiff that unless women came to him themselves, he didn't believe there was a problem. (*Reeves, supra*, 121 Cal.App.4th at pp. 100-101.)

One night the plaintiff ended his shift at midnight, but, almost immediately upon leaving the store, tried to return to use the rest room. A member of the night crew, who had been instructed not to let anybody into the store after it closed, refused to let him in. The plaintiff said "This is an emergency. I have to use the rest room." The night crew member told him if he came in she'd call security. The evidence was conflicting as to whether the plaintiff physically shoved his way into the store at that point, or merely barged in without physical contact with the night crew member. At any rate, after he entered the store, he spoke to two coworkers, a male (ironically one about whom the female coworkers had complained) and a female, who asked him to apologize for the

---

    6       There is no case of which we are aware which insulates disciplinary investigations in FEHA pretext cases from judicial examination. *Cotran v. Rolls Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, was not a FEHA case, but an implied contract case, and even *Cotran* requires "notice of the claimed misconduct" (*id*. at p. 108), which De Jardin assuredly did not receive here.

language he had used when he entered the store. He did so. (*Reeves, supra*, 121 Cal.App.4th at pp. 101-102.)

But the night crew member called the police. When they arrived she told them the plaintiff had pushed her. The next morning, after the store had opened, the plaintiff sought out the store manager in hopes of telling him about the previous night's incident with the night crew member, but the store manager was off. He then began a vacation. (*Reeves, supra*, 121 Cal.App.4th at p. 102.)

Nonetheless, the store manager returned the next day and spoke to the night crew member. The night crew member told the store manager of the confrontation with the plaintiff. The store manager discussed the incident with the two employees with whom the plaintiff had briefly spoken on the night in question. The manager then called the store's security department, said the plaintiff was suspected of "pushing" the night crew member, and asked security to "take a look at it," given it involved "possibly workplace violence." (*Reeves, supra*, 121 Cal.App.4th at pp. 102-103.)

The store's security officer conducted an investigation which eventually included talking to the plaintiff. The security officer later reported to the district manager the plaintiff had been abusive, had been under the influence of alcohol, had used profanity around other employees, and had pushed another employee. The officer recommended discharge, and the district manager determined to fire the plaintiff. As the *Reeves* opinion notes, the district manager made the decision without ever hearing the plaintiff's version of the incident. (*Reeves, supra*, 121 Cal.App.4th at pp. 103-104.)

After the firing, plaintiff sued the grocery store chain, who successfully moved for summary judgment. The trial court granted the store's summary judgment motion, concluding there was no "causal link" between the employee's earlier complaints and his later discharge (*id.* at p. 105) noting it was undisputed that the district manager who actually made the discharge decision was unaware of the employee's previous complaints about sexual harassment of coworkers.

16

The *Reeves* court reversed the judgment, reasoning that there was a triable issue of fact as to whether the store supervisor's animus originating from the employee's previous complaints had "skewed" the investigation of the employee's alleged workplace violence to reach an unfavorable outcome. (*Reeves, supra*, 121 Cal.App.4th at p. 119.) The court noted that by the supervisor's choice to refer the matter to security, an unfavorable outcome had been practically "guaranteed." (*Id*. at pp. 117-118.)

*Reeves* also squarely held that the fact the manager who made the ultimate decision to fire the employee was completely free of any retaliatory animus did not, in and of itself, break any causal link. The *Reeves* court reasoned, "If a supervisor makes another his tool for carrying out a discriminatory action, the original actor's purpose will be imputed to the tool, or through the tool to their common employer." (*Reeves, supra*, 121 Cal.App.4th at p. 113.) Accordingly, the *Reeves* court reasoned the mere fact the manager who fired the plaintiff did not know of the plaintiff's prior complaints about sexual harassment "could not conclusively negate the element of causation" necessary for a successful retaliation claim. (*Reeves, supra*, 121 Cal.App.4th at p. 110.) A significant part of the court's rationale was the store supervisor with the possible retaliatory animus tainted the investigation of misconduct to put it in the "'worst possible light.'" The quotations from the Seventh Circuit's *Shager* opinion are illustrative in that regard.[7]

---

[7]     We will repeat them in this footnote:

"If a supervisor makes another his tool for carrying out a discriminatory action, the original actor's purpose will be imputed to the tool, or through the tool to their common employer.

The *Reeves* court noted the store manager's influence "'may have been decisive'" (*Reeves, supra*, 121 Cal.App.4th at p. 113). A jury could come to the same conclusion here.

Our dissenting colleague posits that *Reeves* is a case where the store manager with retaliatory animus *triggered* the investigation that got the plaintiff fired, while in the present case the triggering event can be better laid at the feet of either Barragan who brought the initial complaint, or perhaps Ryleen Granada-Madrigal, who made the comment she too had been harassed by De Jardin when she was asked to be on the committee investigating the Barragan complaint. We must respectfully part company on that detail for two reasons.

The minor reason is that the store manager in *Reeves* no more "triggered" the investigation than Cabra did here. In *Reeves*, the night crew member effectively triggered the investigation by calling the police, just as here Barragan effectively triggered the investigation by making a complaint of sexual harassment.

The major reason is that the main point of *Reeves* cannot be accurately characterized as resting on whether an actor harboring allegedly retaliatory animus *triggers* a disciplinary investigation, but whether such an actor is in a position to so

---

"The clearest explication of this concept was provided by Judge Posner in *Shager v. Upjohn Co.*, *supra*, 913 F.2d 398. The district court there granted the employer's motion for summary judgment, in part because the plaintiff had been discharged by decision of a 'Career Path Committee,' whose members did not appear to have acted with discriminatory animus. In reversing, Judge Posner wrote that the committee's decision to fire the plaintiff did not necessarily insulate the employer from the age-related animus exhibited by the plaintiff's supervisor Lehnst; rather the decision 'was tainted by Lehnst's prejudice' because he 'not only set up Shager to fail by assigning him an unpromising territory but influenced the committee's deliberations by portraying Shager's performance to the committee in the worst possible light." [Citation.] In language with distinct parallels to the facts a jury might find here, Judge Posner explained further: 'Lehnst's influence may well have been decisive. The committee's deliberations . . . were brief, perhaps perfunctory; no member who was deposed could remember having considered the issue. A committee of this sort, even if it is not just a liability shield invented by lawyers, is apt to defer to the judgment of the man on the spot. Lehnst was the district manager; he presented plausible evidence that one of his sales representatives should be discharged; the committee was not conversant with the possible age animus that may have motivated Lehnst's recommendation. If it acted as the conduit of Lehnst's prejudice – his cat's-paw – the innocence of its members would not spare the company from liability." (*Reeves, supra*, 121 Cal.App.4th at pp. 113-114.)

*influence* the investigation so as to "skew" it to put the employee in the worst possible light. We do not read *Reeves* as narrowly as our dissenting colleague.

*DeJung v. Superior Court* (2008) 169 Cal. App. 4th 533 supports our reading of *Reeves*. *DeJung* involved the non-retention of a superior court commissioner in a process that – as one might suppose naturally – involved the presiding judge of that particular superior court who chaired the executive committee of the court making the decision. But the presiding judge uttered some pretty clear statements indicating age-bias (see *DeJung, supra*, 169 Cal.App.4th at p. 541 ["Ted's a great guy, but we're looking for someone younger."]). In a decision tracking the lines of both *Reeves* and *Shager*, the appellate court reversed a summary judgment for the superior court in the commissioner's age discrimination suit, declaring: "Thus, showing that *a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory*, even absent evidence that others in the process harbored such animus." (*Id*. at p. 551, italics added.) Clearly Cabra was a "significant participant" in the decision-making process.

2. *Yanowitz*

*Yanowitz* is a little different from *Reeves* and the case before us, in that there was no formal investigation of the plaintiff. But other than that difference, the facts are certainly close enough to convince us that *Yanowitz* also compels reversal of the summary judgment in the case before us.

*Yanowitz* involved the retaliation claim of a regional sales manager of a perfume company. An executive from the New York head office came out to visit the sales manager's operation in the fall of 1997. The sales manager and the executive toured the company's installation at a Macy's in San Jose. An employee at the installation was a "dark skinned female sales associate" whose very appearance displeased the New York executive. He instructed the manager to fire the associate and get the company "'somebody hot'" and expressed "a preference for fair-skinned

19

blondes." (*Yanowitz, supra*, 36 Cal.4th at p. 1038.) The sales manager, however, asked for "an adequate justification" before she would fire the associate. The executive persisted in requesting the sales manager fire the associate on "several subsequent occasions" and each time the manager required "adequate justification" for the move. (*Ibid*.) Significantly, the sales manager never expressly articulated any belief to the executive that the request to fire the associate was discriminatory. (*Ibid*.) The "adequate justification" apparently never came.

What came, by contrast, was a series of actions by the executive and his immediate subordinate making the sales manager's experience at the firm more difficult. There were "unwarranted negative performance evaluations," inconvenient meeting scheduling that made it difficult for her to respond to criticism, public (i.e., in front of other staff) reprimands by the subordinate, imposition of a new (and apparently inflexible) travel schedule on her, and – perhaps most tellingly for our purposes – the subordinate's solicitation of negative information about the sales manager. (See *Yanowitz, supra*, 36 Cal.4th at pp. 1039-1040, 1055.) The sales manager departed on disability stress leave, did not return, then sued for retaliation. (*Id.* at p. 1040.) The trial court granted the erstwhile employer's summary judgment motion, but the Supreme Court affirmed the appellate court's reversal.

In saying summary judgment was not appropriate, our high court in *Yanowitz* said that there was enough presented by the sales manager to allow a jury to conclude the company's "stated nonretaliatory grounds" were "pretextual." (*Yanowitz, supra*, 36 Cal.4th at p. 1061.) It was true the company already had some reason to be displeased with the sales manager even prior to her recalcitrance in following the order to fire the sale associate. A memo criticized her "'listening' skills" and general attitude. Further, there were complaints from customers, including some corporate customers, expressing a desire not work with her. (*Ibid*.) However, the Supreme Court held this evidence was "not sufficient in itself to support the trial court's grant of summary

20

judgment." (*Ibid*.) There were offsetting positive performance reviews, and she had even been named sales manager of the year during the year of the alleged retaliatory acts. (*Id*. at pp. 1061-1062.) And – what seems to have most animated the high court's rationale -- the *active solicitation* of negative information "strongly suggest[ed]" the possibility of a "search for a pretextual basis for discipline, which in turn suggest[ed] that the subsequent discipline imposed was for purposes of retaliation." (*Id*. at p. 1062.)

Our dissenting colleague points out that neither *Reeves* nor *Yanowitz* involved cases where a plaintiff claiming an adverse employment action in retaliation for protected activity was charged with sexual harassment. But the significance of that point eludes us. We are aware of nothing in FEHA law which treats adverse action based on sexual harassment any differently than poor work performance (*Yanowitz*) or workplace violence (*Reeves*). Indeed, the employer in *Reeves* could no more ignore the night crew member's complaint of workplace violence than Kindred could ignore Barragan's complaint of sexual harassment. The point is not the legitimacy of the proffered reason – both poor work performance and sexual harassment are quite legitimate reasons for adverse action – but the triable issue of retaliatory animus in the application of the proffered reason to the case at hand.

D. *Other Issues*

1. *Dismissal of KHOI*

De Jardin argues that Kindred's parent, KHOI, can be held liable as Kindred's agent under section 12926, subdivision (d) [employer can himself be agent for employer].) Evidence in the summary judgment motion established that De Jardin's W-2 forms lists KHOI as "Agent for THC-Orange County, Inc." and that KHOI and Kindred filed unitary California tax returns.

De Jardin cites no evidence, however, which might show that KHOI was acting as Kindred's *agent* for purposes of Kindred's employment policies or decisions. There is no evidence KHOI had anything to do with any of the events of this case. If a

21

*supervisor* is not an agent under FEHA (*Haligowski v. Superior Court* (2011) 200 Cal.App.4th 983, 990) it follows a fortiori that a mere corporate parent company is not.

## 2. *Dismissal of Contract Claim Against Kindred and Cabra*

As framed in De Jardin's original complaint, his third cause of action, for breach of contract, is predicated on the theory that Cabra (and Cabra as agent for Kindred) violated the written confidentiality agreements which both he and De Jardin signed at the beginning of the Gordon and De Jardin investigations. Preliminarily, we decline to consider De Jardin's contention the trial court erred in dismissing his breach of contract action to the degree it is predicated on the breach of *oral* confidentiality agreements in addition to the written confidentiality agreements signed at the beginning of the Gordon and De Jardin investigations. The reason is simple: He never pleaded the breach of an oral contract and the issue is being raised for the first time on appeal.

However, regardless of whether a confidentiality agreement was written or oral, De Jardin's *evidence* of a breach of some kind of confidentiality agreement is insufficient. His best evidence of such a breach consists of the antagonistic text messages he received from Gordon, which he says were indicative of Cabra having divulged the substance of De Jardin's testimony in the Gordon investigation to coworkers. De Jardin also points to a subjective chill he felt from day shift workers in the aftermath of the Gordon investigation, plus a statement from another respiratory therapist made just after his August 2 suspension to the effect "HR's got Rassi . . . People who go to HR never return."

## 3. *Punitive Damages*

The trial court did not rule on Kindred's separate motion for summary adjudication of De Jardin's punitive damages claim. We now are reversing the summary judgment. As to the motion for summary adjudication concerning De Jardin's punitive damage claim, we follow our colleagues in the First District in remanding the case to the trial court to consider the motion for summary adjudication for the first time at the trial

22

court level.  (See *State Farm General Ins. Co. v. Wells Fargo Bank, N.A.* (2006) 143 Cal.App.4th 1098, 1119-1120 [in case where summary judgment was reversed but motion for summary adjudication had not been addressed in trial court, declining to address arguments on summary adjudication motion "for the first time on appeal," but rather remanding "the case for the trial court to do so"].)  To be clear:  We express no opinion on the issue of punitive damages, which we leave for the trial court to address for the first time.

## III.  DISPOSITION

The judgment is reversed as to De Jardin's first and second causes of action for retaliation and wrongful discharge against THC-Orange County, Inc., which we have called "Kindred" in this opinion.  The judgment is affirmed to the degree it dismisses Kindred Healthcare Operating, Inc., which we have called "KHOI" in this opinion, and to the degree it dismisses Lito Cabra from the action entirely, and also to the degree it dismisses De Jardin's third cause of action against Kindred for breach of contract.

As the overall prevailing party on the major claims of retaliation and wrongful termination, though, De Jardin shall recover his costs on appeal.

BEDSWORTH, ACTING P. J.

I CONCUR:

IKOLA, J.

23

FYBEL, J., Dissenting and Concurring.

I respectfully and strongly dissent from the majority opinion's reversal of the summary judgment granted in favor of Kindred Hospital (Kindred) with regard to Rassi De Jardin's claim of retaliation under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA), as well as his claim of wrongful discharge in violation of public policy. The judgment should be affirmed.

De Jardin's complaint alleges that his retaliation claim is based on the termination of his employment. The undisputed evidence shows De Jardin's employment was terminated after Kindred received unsolicited information that De Jardin sexually harassed a female employee, and, in conducting a statutorily mandated sexual harassment investigation, learned that several other female employees claimed to have been subjected to physical and verbal conduct of a sexual nature by De Jardin. There is no evidence showing Kindred's decision to terminate De Jardin's employment for sexual harassment was in any way motivated by retaliatory animus against De Jardin for his cooperation in an earlier racial harassment investigation of coworker Michael Gordon. Summary judgment was therefore properly granted.

The majority opinion:

—Ignores provisions of FEHA, mandating that employers conduct sexual harassment investigations;

—Ignores and directly conflicts with *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327 (*Arteaga*), which requires, inter alia, judicial restraint on second-guessing an employer's sexual harassment investigation;

—Unfairly and incorrectly labels Kindred's sexual harassment investigation as a "general fishing expedition" (maj. opn., *ante*, at p. 2) simply because Kindred investigated each and every instance of sexual harassment that employees had

1

reported to it, in accordance with FEHA's *requirement* that Kindred conduct such an investigation; and

—Improperly applies the holdings of *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95 (*Reeves*) and *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028 (*Yanowitz*), when the courts in those cases, unlike the instant case, had before them *evidence* showing that retaliatory animus caused an adverse employment action.

My colleagues, in the majority opinion, claim my focus on termination of employment for sexual harassment "eludes" them. (Maj. opn., *ante*, at p. 21.) In the following discussion, the reader can decide whose analysis—the majority's or mine—is elusive.

I.

FEHA IMPOSES LIABILITY ON EMPLOYERS FOR SEXUAL HARASSMENT THEY KNEW OR SHOULD HAVE KNOWN ABOUT AND MANDATES THE INVESTIGATION OF ALL SEXUAL HARASSMENT CLAIMS IN THE WORKPLACE.

FEHA, at Government Code section 12940, subdivision (j)(1), prohibits harassment based on, inter alia, sex or gender. Unlike discrimination, which refers to bias in the exercise of an employer's official action, harassment "refers to bias that is expressed or communicated through interpersonal relations in the workplace." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 707.) Even though FEHA discrimination and harassment claims are distinct causes of action, "nothing prevents a plaintiff from proving these two violations with the same (or overlapping) evidentiary presentations." (*Roby v. McKesson Corp.*, *supra*, at p. 709.)

Harassment is defined in title 2 of the California Code of Regulations, section 11019, subdivision (b), as including verbal harassment, physical harassment, and visual forms of harassment (e.g., the display of offensive images). An employer might be liable for sexual harassment by nonsupervisory employees where the employer, "or its

2

agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action," and "shall take all reasonable steps to prevent harassment from occurring." (Gov. Code § 12940, subd. (j)(1); Cal. Code Regs., tit. 2, § 11019, subd. (b)(3) [harassment by a coemployee "is unlawful if the employer . . . , its agents or supervisors knows of such conduct and fails to take immediate and appropriate corrective action" and "[i]f the employer . . . , its agents or supervisors did not know but should have known of the harassment, *knowledge shall be imputed* unless the employer or other covered entity can establish that it took reasonable steps to prevent harassment from occurring" (italics added)].)

FEHA requires employers to "take all reasonable steps to prevent harassment from occurring." (Gov. Code, § 12940, subd. (j)(1).) One such reasonable step, which is also "required in order to ensure a discrimination-free work environment, is a prompt investigation of the discrimination claim." (*California Fair Employment & Housing Com. v. Gemini Aluminum Corp.* (2004) 122 Cal.App.4th 1004, 1024; see *Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.* (2002) 103 Cal.App.4th 1021, 1035-1036 ["Prompt investigation of a discrimination claim is a necessary step by which an employer meets its obligation to ensure a discrimination-free work environment"]; *American Airlines, Inc. v. Superior Court* (2003) 114 Cal.App.4th 881, 890 ["To carry out its obligation to prevent discrimination by investigating claims, an employer likely will need to obtain information from a wrongdoer's co-workers who were in a position to witness the misconduct and identify the wrongdoer"].)

"'The public policy against sex discrimination and sexual harassment in employment . . . is plainly one that "inures to the benefit of the public at large rather than to a particular employer or employee." [Citation.] No extensive discussion is needed to establish the fundamental *public* interest in a workplace free from the pernicious

3

influence of sexism.  So long as it exists, we are *all* demeaned.'" (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 224.)

## II.

KINDRED'S SEXUAL HARASSMENT-FREE WORKPLACE POLICY EXPRESSLY WARNED OF IMMEDIATE EMPLOYMENT TERMINATION FOR ENGAGING IN SEXUAL HARASSMENT; IT IS UNDISPUTED DE JARDIN WAS ACCUSED BY SEVERAL COWORKERS OF COMMITTING CONDUCT EXPRESSLY PROSCRIBED BY THIS POLICY.

It is undisputed De Jardin was aware of Kindred's sexual harassment policy.  He admitted he had read the employee handbook and understood that if he engaged in sexual harassment, his employment with Kindred could be immediately terminated.  Kindred's employment handbook contains a policy entitled, "Sexual Harassment-Free Workplace," which states in full as follows:

"Kindred is committed to maintaining a work environment for employees free from sexual harassment.  Sexual harassment includes harassment based on pregnancy, childbirth or related medical conditions.

"Sexual harassment is a specific form of harassment, which consists of unwelcome sexual advances or offensive visual, verbal or physical conduct of a sexual nature.  Sexual harassment may occur when:

"• submission to or rejection of sexual advances or requests for sexual favors is made an implicit or explicit condition of employment,

"• submission to or rejection of sexual advances or requests for sexual favors is used as a basis for employment decisions, or

"• an intimidating, hostile or offensive work environment interferes with the ability to perform job duties.

"No Kindred supervisory employee may threaten or insinuate that an individual's submission to or rejection of sexual advances will in any way influence

4

decisions affecting the individual.  No Kindred employee shall create a hostile or offensive work environment for others.

"Examples of prohibited conduct include, but are not limited to:

"• offensive verbal conduct (i.e., sexual comments, sexual jokes, slurs),

"• sexually suggestive letters, notes, email or voice mail messages,

"• unwelcome sexual flirtations or advances,

"• unwelcome comments about a person's body, discussion of sexual activities or experiences,

"• offensive physical conduct (i.e., improper touching, obscene gestures or assault), or

"• visual harassment (i.e., leering, sexually explicit photographs, cartoons or drawings).

"It is inappropriate for an employee who has supervisory responsibilities to engage in a close personal, dating or sexual relationship with a person directly or indirectly reporting to him or her.  Kindred prohibits such relationships where it creates a conflict of interest or negative effect on workforce morale.  An employee who has supervisory responsibilities must advise his or her supervisor of such relationship.

"*Kindred prohibits harassing conduct even if it does not rise to the level of legally actionable conduct.*"  (Italics added.)

It is undisputed that De Jardin was accused by several female coworkers of engaging in conduct that squarely violates this policy.  Contrary to the majority opinion's characterization of that conduct as suggesting De Jardin might have merely "been too familiar with them" (maj. opn., *ante*, at p. 6), the uncontradicted evidence shows he was accused of making sexual comments, engaging in unwelcome sexual flirtations or advances toward female coworkers, making unwelcome comments about their bodies,

5

discussing his sexual activities or experiences, improperly touching them, and showing them, on at least one occasion, a photograph of his genitalia.

In an attempt to show the existence of a triable issue of material fact, the majority opinion identifies, as evidence of retaliatory animus, Kindred's decision to *terminate* De Jardin's employment for sexual harassment, as opposed to applying a progressive correction approach to address his conduct. But, as acknowledged by De Jardin, Kindred's employee handbook expressly states that employees who have been found to have violated its policies against discrimination, harassment, or retaliation "are subject to disciplinary measures, up to and including separation of employment." Similarly, Kindred's "Standards Of Conduct" policy in its employee handbook identifies "violating Kindred's policies, including but not limited to conflict of interest, harassment, discrimination" as "gross or serious misconduct which may result in action up to and including *immediate* separation of employment." (Italics added.) The majority opinion acknowledges that Kindred's employee handbook expressly excepts "serious misconduct" from its "progressive correction approach." (Maj. opn., *ante*, at p. 9.) De Jardin did not produce evidence or argue that Kindred has meted out less severe punishment for similar conduct. It is undisputed Kindred followed its policy to a tee when it terminated Gordon's employment following its investigation regarding complaints of harassment by Gordon.

III.

DE JARDIN FAILED TO CARRY HIS BURDEN OF PRODUCING SUBSTANTIAL RESPONSIVE EVIDENCE SHOWING THAT KINDRED'S ASSERTED REASON FOR TERMINATING HIS EMPLOYMENT FOR SEXUAL HARASSMENT WAS UNTRUE OR PRETEXTUAL.

As discussed in the majority opinion, Kindred carried its burden of producing evidence that De Jardin's employment was terminated for a legitimate business reason, namely, because Kindred had concluded, following an investigation, that

6

De Jardin had engaged in sexual harassment of female coworkers in the workplace. Therefore, pursuant to the applicable burden-shifting requirement set forth in *Yanowitz, supra*, 36 Cal.4th at page 1042, the presumption of retaliation that arose after De Jardin made a prima facie showing of retaliation ""'"drops out of the picture,"'" and the burden shifts back to the employee to prove intentional retaliation."

To avoid grant of summary judgment at this stage of the burden-shifting requirement, De Jardin had the burden of producing ""'"substantial responsive evidence"'" that Kindred's reason for terminating his employment was either untrue or pretextual. (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 807.) As the California Supreme Court has explained: "[T]here must be evidence supporting a rational inference that *intentional discrimination, on grounds prohibited by the statute, was the true cause* of the employer's actions. [Citation.] Accordingly, the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 361.) In short, De Jardin was required to ""'"do more than establish a prima facie case and deny the credibility of the [defendant's] witnesses,"'" but produce specific and substantial evidence of pretext. (*Horn v. Cushman & Wakefield Western, Inc., supra,* at p. 807; see *Arteaga, supra,* 163 Cal.App.4th at p. 357 ["Where the employee relies solely on temporal proximity in response to the employer's evidence of a nonretaliatory reason for termination, he or she does not create a triable issue as to pretext, and summary judgment for the employer is proper"].) De Jardin failed to produce the required evidence.

The majority opinion's conclusion De Jardin carried his burden of producing evidence of intentional retaliation is expressly based on evidence of "the

7

expansion of the investigation of the single sexual harassment complaint made against De Jardin . . . into a general fishing expedition looking for any arguable sexual harassment charges that might be lodged against him." (Maj. opn., *ante*, at p. 2.) As I will demonstrate, the majority opinion's characterization of Kindred's response to information it received that certain female employees had been sexually harassed by De Jardin as a general fishing expedition is neither supported by the record before us nor by the law, which statutorily mandated Kindred to investigate all claims of sexual harassment. As a result, Kindred's required investigation of several complaints of sexual harassment was not "general," it was not "fishing," and it was not an "expedition."

A.

*Kindred Receives Unsolicited Reports That Several Female Employees Believed They Had Been Sexually Harassed by De Jardin; After Conducting a Sexual Harassment Investigation, Kindred Decides to Terminate De Jardin's Employment.*

Initially, I note that De Jardin does not contend that any complaint of sexual harassment lodged against him had any connection to his participation in the Gordon investigation or to Lito Cabra, De Jardin's supervisor, much less that any such complaint originated with Cabra whom, De Jardin claims, bore him illegal retaliatory animus.

It is undisputed that on August 2, 2011, Sandra Barragan complained to Maria Laureano (Kindred's human resources coordinator) that De Jardin had sexually harassed her during the prior night shift they worked together. Barragan complained to Laureano that De Jardin told Barragan that if she had not been married, he would "kiss those lips," and wanted take her out. Barragan stated De Jardin also asked her for a hug, tried to kiss her, and asked if he could "feel her 'boobies.'"

Laureano told Barragan she would conduct an investigation. Laureano asked the director of nursing, Charlotte Cook, and Cabra to participate in interviews.

8

Cook, in turn, asked Barragan's manager, nurse Rylene Madrigal, to participate in the investigation. Madrigal, however, declined to participate in the investigation, volunteering that *she* felt it would be inappropriate because she had been sexually harassed by De Jardin a few years earlier. Madrigal stated that De Jardin flirted with her and said, inter alia, "I would like to take you out if you weren't married," and "[y]ou're so pretty." She said that he also bragged to her about his dates and sexual encounters. Madrigal also volunteered the names of three nursing staff members (Conchita Somido, Darlene Villaber, and Jennifer Tanqueco) who, she thought, had also been subjected to inappropriate conduct by De Jardin.

Once Kindred was informed that other employees felt they too had been sexually harassed, Kindred had a *statutory* duty to investigate whether sexual harassment by De Jardin had occurred in the workplace, *regardless* of whether those employees had earlier elected to report that conduct to Kindred. (Gov. Code, § 12940, subd. (j)(1); *Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.*, *supra*, 103 Cal.App.4th at pp. 1035-1036.) The majority opinion's position that Kindred's investigation had to stop with Barragan is contrary to well-established law, as I have explained. Kindred interviewed Madrigal who reiterated what she had told Cook.

During her interview, Villaber stated that about six months earlier, De Jardin had often asked her out, and, on at least one occasion, asked her out on a "hot date." She stated that on one occasion, he walked into the nurses' lounge and hugged her, which made her feel uncomfortable. The majority opinion asserts that Villaber had stated De Jardin's hugs were done in a friendly manner and that "[o]n summary judgment we must draw the inference that Villaber might have indicated to the committee that De Jardin had been perhaps overfamiliar, but Villaber did not initially think his conduct rose to level of actual sexual harassment." (Maj. opn., *ante*, at pp. 8-9.) The majority

9

opinion's musings on possibilities are speculative. It is undisputed Villaber described inappropriate conduct of a sexual nature in violation of Kindred's policy.

During an interview, Tanqueco stated that when she carpooled with De Jardin, "on occasion he would tell her that he liked to pursue married women and revealed his preference for relationships with married women." Tanqueco further stated she heard De Jardin asking coworkers on dates, requesting kisses and hugs from them, and using foul language around women. Tanqueco saw him follow nurses around the floor. She also stated that on one occasion, "she overheard laughter coming from the dictation room and one of the nurses saying, 'Oh my, that's disgusting.' When she asked what the commotion was, she was told that Mr. De Jardin had just shown them a photograph of his genitals, which he had on his cellphone."

In an interview, Somido stated that in early 2010, De Jardin asked her out on "multiple occasions" even though she responded that she was married. Somido said De Jardin also made statements to her to the effect of "[o]h baby, you're so hot today." She told him that he should not ask coworkers to go out with him and that it was not nice or ethical to do so. Somido stated she heard De Jardin bragging about having sexual intercourse with a "hot" woman whom he dated.

De Jardin does not challenge, by evidence or by argument, that Kindred received those complaints. He does not contend the complaints were anything other than independent complaints; there is no allegation of collusion among the complainants. Once Laureano was informed (through Cook and Madrigal) of reports that other employees had complained of conduct that might constitute sexual harassment by De Jardin, Kindred was on notice of possible sexual harassment in the workplace and was statutorily required to investigate; it is irrelevant whether the complaining parties had previously lodged a formal complaint or otherwise come forward with that information.

10

That De Jardin denies the merit of the sexual harassment claims is irrelevant to our analysis—the issue presented is not whether Kindred came to the *correct* conclusion but whether its conclusion was motivated by retaliatory animus. As explained in *Arteaga*, *supra*, 163 Cal.App.4th at page 343, "'"[t]he [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. . . . Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' . . . and hence infer 'that the employer did not act for the [asserted] non-discriminatory reasons.' . . ."'"

Our record shows that after conducting interviews, Laureano briefed Kindred's regional human resource director, Jeffrey Sopko, on the findings of the investigation. Laureano and Sopko concluded that although they could not decide whether Barragan's complaint was credible, the investigation revealed consistent reports that De Jardin had engaged in a pattern of inappropriate behavior; and determined that his employment should be terminated. Kindred's chief clinical officer, Kathryn Ross, made the final decision to terminate De Jardin's employment. Kindred had reports from several female nurses about De Jardin. The conduct described in those complaints violated Kindred's written employment policies. Faced with employee complaints that, in essence, described in detail how De Jardin was a serial sexual harasser, Kindred took the only responsible action: Kindred lawfully terminated De Jardin's employment.

As discussed *ante*, De Jardin does not contend that the decision to terminate his employment violated any policy or practice by Kindred, or that the decision to terminate his employment was any more severe a resolution following investigation than what Kindred would have done under the same circumstances with another employee.

11

Citing *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 108, the majority opinion, more than once, points out that De Jardin was not given "notice" of the specific allegations of sexual harassment that were made by the four nurses during their interviews, which occurred after De Jardin's interview. The court in *Cotran v. Rollins Hudig Hall Internat., Inc.* explained the analysis to be applied by the courts in reviewing the employment termination of an employee whose employment contract provided for termination only for good cause. "This is not the standard, however, when an at-will employee is terminated." (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1532-1533.) It is undisputed De Jardin was an at-will employee, not an employee whose employment could only be terminated for good cause or in accordance with a contract.

In any event, it is undisputed that De Jardin was interviewed as part of the investigation, during which Laureano and Cook not only asked De Jardin about Barragan's allegations, but also whether he had acted inappropriately with any other female coworkers by touching them, asking them out, kissing them, hugging them, or making any inappropriate comments to them. Relying on De Jardin's deposition testimony, the majority opinion asserts this fact is disputed. But, at his deposition, De Jardin admitted that he had been asked about his conduct with other coworkers, but then backtracked and said he did not remember whether he had been asked about his conduct with nurses other than Barragan. De Jardin's initial "[y]es" response and his "I don't remember" response do not equal a "no." Quite simply, De Jardin's own deposition responses are insufficient evidence to create a triable issue of material fact as to whether De Jardin was asked about his conduct with coworkers other than Barragan.

Neither *Cotran v. Rollins Hudig Hall Internat., Inc.*, *supra*, 17 Cal.4th 93, nor any other legal authority, requires an employer to give notice to an at-will employee of a specific allegation of misconduct uncovered in a FEHA investigation, particularly

12

after the employee generally denied having engaged in any misconduct. Any failure to provide notice of specific allegations to De Jardin, under those circumstances, does not create a triable issue of material fact as to retaliatory animus.[1]

B.

*De Jardin Failed to Produce Evidence Showing the Decision to Terminate His Employment Was Influenced by Cabra.*

The majority opinion concludes there was "substantial evidence of a causal link between [Cabra]'s animus and De Jardin's termination" because of "evidence of [Cabra]'s displeasure with De Jardin's testimony in the [Gordon] investigation combined with his substantial role in the investigation of the sexual harassment complaint against De Jardin, which allowed him to put De Jardin in the worst possible light." (Maj. opn., *ante*, at p. 2.)

Before explaining why I disagree here, I must address the applicable standards of causation. At oral argument, counsel for both De Jardin and Kindred confirmed their positions that the burden-shifting requirement set forth in *Yanowitz*, *supra*, 36 Cal.4th at page 1042, applied to this case, and, thus, De Jardin was required to produce evidence showing that Kindred's reason for terminating his employment was a pretext for retaliation in violation of FEHA. (See *Guz v. Bechtel National, Inc.*, *supra*, 24

---

[1] "The FEHA does 'not guarantee employees "a stress-free working environment."' [Citation.] '[FEHA] does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. "[The FEHA] addresses discrimination." . . . "[It] is not a shield against harsh treatment at the workplace." . . . Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous fact, or for no reason at all, as long as its action is not for a discriminatory reason. . . . "While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is . . . whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve."'" (*Arteaga*, *supra*, 163 Cal.App.4th at p. 344.)

13

Cal.4th at p. 361 ["the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory"].) Counsel also agreed that this was not a "mixed-motive" case in which an adverse employment action was based on a mixture of retaliatory and legitimate motives and in which De Jardin would have had the burden of proving that illegal retaliation was "'a substantial motivating factor/reason'" for his employment termination. (*Harris v. City of Santa Monica*, *supra*, 56 Cal.4th at p. 232.) As Justice Mallano of the Court of Appeal, Second Appellate District, Division One, explained in *Arteaga*, *supra*, 163 Cal.App.4th at page 357, because there is no evidence Kindred had mixed motives (legitimate and illegitimate reasons for terminating De Jardin's employment), "we do not decide whether a mixed-motive analysis applies under the FEHA or in this case."

Regardless whether this case is perceived as involving mixed motives, it does not change the result on this record because there is no evidence any retaliatory animus on Cabra's part was in any way a motivating factor or reason for De Jardin's employment termination. Significantly, De Jardin does not contend that Laureano, Cook, Sopko, or Ross bore any retaliatory animus toward him for his participation in the Gordon investigation. His argument is that *Cabra* was the one with the retaliatory animus, and, through Cabra's participation in the investigation, he was able to steer it to its conclusion, resulting in De Jardin losing his job. The majority opinion concludes: "Cabra's extensive role in the investigation of Barragan's complaint creates a reasonable inference he was able to implement his retaliatory animus in the course of that investigation, i.e., there was a causal link between the animus and the firming. Cabra acted as de facto witness, and communicated directly to the ultimate decisionmaker, Ross." (Maj. opn., *ante*, at p. 14.)

14

The majority opinion fails to describe any evidence that supports its conclusion that Cabra's role in the sexual harassment investigation was "extensive." My review of the record reveals that, as De Jardin's supervisor, Cabra attended a couple of interviews. Cabra also told Laureano at some point in time that he thought De Jardin was kidding half of the time, and, on one occasion, De Jardin had felt Cabra's muscles, comments that apparently underlie the majority opinion's assertion that Cabra was able to place De Jardin in the "worst possible light." (Maj. opn., *ante*, at p. 2.) The majority opinion points out evidence that Ross "talked to Cabra about De Jardin's firing." (*Id.* at p. 8.) The majority opinion does not provide any evidence about that conversation— apparently persuaded by the bare fact that Ross was "exposed to lobbying from Cabra." (*Ibid.*) Such speculation does not create a triable issue of material fact that Cabra had *any* impact on the decision in this case. (*Horn v. Cushman & Wakefield Western, Inc.*, *supra*, 72 Cal.App.4th at p. 807 [noting, "[w]e emphasize that an issue of fact can only be created by a conflict of evidence. It is not created by speculation or conjecture"]; see *DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 550 [employee must produce "evidence of a causal relationship between the animus and the adverse employment action"].)

Furthermore, the majority opinion's inferences are at odds with the Evidence Code and the recent Supreme Court opinion in *People v. Davis* (2013) 57 Cal.4th 353. In *People v. Davis*, *supra*, 57 Cal.4th at page 360, the court explained: "'An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' (Evid. Code, § 600, subd. (b).) However, '[a] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." [Citation.]' (*People v. Morris* (1988)

15

46 Cal.3d 1, 21 . . . , quoting *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 45 . . . [*Morris* disapproved on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 543-544, fn. 5 . . . ].)"  As in *People v. Davis*, *supra*, 57 Cal.4th at page 360, "the evidence to support the critical inference was lacking."

This case is, therefore, materially distinguishable from *Reeves*, *supra*, 121 Cal.App.4th at page 100, in which "the supervisor *who initiate*[*d*] disciplinary proceedings" (italics added), which led to the termination of the plaintiff's employment, "act[ed] with retaliatory animus" in violation of FEHA.  Ironically, in *Reeves*, the plaintiff alleged he was retaliated against for bringing female coworkers' sexual harassment complaints to a manager's attention; the manager refused to properly investigate those complaints.  (*Reeves*, *supra*, at pp. 105, 100-101.)  In *Reeves*, the *evidence* showed that after the plaintiff was involved in an incident in which he pushed a female coworker out of his way as he tried to quickly get to a bathroom, the manager escalated the seriousness of the incident by characterizing it as involving "'possibly workplace violence'" and "'obviously a security issue.'"  (*Id.* at pp. 101-103.)  The manager further escalated the matter by referring it to security for investigation, instead of the human resources department.  (*Id.* at p. 117.)  The appellate court noted, "there is substantial *evidence* that [the manager] knew such a referral was substantially certain to result in the dismissal of a 29-year veteran employee" and that he knew "every case he ever referred to security resulted in dismissal where it involved 'an allegation of improper conduct' comparable to the allegations against [the plaintiff]."  (*Id.* at pp. 117-118, italics added.)

Here, there is no *evidence* Cabra initiated the sexual harassment investigation of De Jardin, weighed in on the validity of any allegations made against him, or otherwise escalated the investigation toward the resolution of employment termination.  The only evidence of comments made by Cabra showed he made statements

16

to Laureano that he thought De Jardin was kidding half the time and that years earlier, De Jardin had felt Cabra's muscles. The record in *Reeves* is a far cry from the record in the instant case.

This case is also distinguishable from *Yanowitz*, *supra*, 36 Cal.4th at pages 1035, 1038-1039, in which an employee, who refused the directive of her supervisor's supervisor to fire an employee for being dark-skinned, suffered adverse employment actions. The employee produced evidence that her direct supervisor engaged in the "active solicitation of negative information" about her, at the urging of his supervisor, which "strongly suggest[ed]" that they were "engaged in a search for a pretextual basis for discipline, which in turn suggest[ed] that the subsequent discipline imposed was for purposes of retaliation." (*Id.* at p. 1062.)

Unlike *Yanowitz*, the evidence in this record shows an employer responding to female employees' complaints of sexual harassment by a coemployee, De Jardin. There is no evidence Kindred's stated reason to terminate De Jardin's employment for serial sexual harassment was pretextual or untrue.

For all these reasons, I believe the trial court was correct in granting summary judgment. An analysis of the record shows an employer that conducted a statutorily mandated investigation of independent complaints by employees of sexual harassment of them by De Jardin. The evidence shows that, based on those complaints, De Jardin's employment was terminated. The record before us contains no evidence of pretext and the inferences relied on in the majority opinion are speculation and insufficient to satisfy the statutory test of a triable issue of material fact. The majority opinion's legal analysis is in conflict with Government Code section 12940, subdivision (j)(1) and with *Arteaga*, *supra*, 163 Cal.App.4th 327, and the cases cited therein.

17

I concur in the majority opinion's affirmance of the judgment dismissing from the action: (1) Kindred Healthcare Operating, Inc.; (2) Lito Cabra; and (3) the breach of contract claim.


FYBEL, J.

18